GARY M. MURPHY, PLAINTIFF AND APPELLANT, *v.* RICHARD REDLAND, JR., E. M. BERTHELSON AND SIDNEY LIVE-STOCK MARKET CENTER, DEFENDANTS AND RESPONDENTS.

No. 13941.
Submitted on Briefs March 31, 1978.
Decided Aug. 22, 1978.
Rehearing Denied Sept. 20, 1978.
583 P.2d 1049.

Jerome J. Cate, Billings, for plaintiff and appellant.

Habedan, Cumming & Best, Sidney, submitted on briefs without oral argument, for defendants and respondents.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

Appeal by appellant, Gary M. Murphy is from a judgment in the District Court of the Seventh Judicial District, Dawson County, awarding judgment against Gary M. Murphy and in favor of Richard Redland, Jr. and E. M. Berthelson, in a cause tried to the District Court without a jury.

The matter comes on regularly for decision in this Court, as one classified under the Internal Operating Rules of this Court (November 17, 1977) for submission without oral argument.

The case is a welter of confusing contentions and countercontentions. Stated as simply as possible the parties entered into a written agreement dated April 10, 1976 whereby they established between them, a joint venture for the purchase of cattle, to be grazed on lands to be supplied by Murphy. Each of the parties was required to bear one-third of purchase price, one-third of expenses of grazing and running the cattle, and receive one-third of the net profit after the cattle had been sold.

These are the facts as we glean them from the record:

In early 1976, Murphy had possession of lands in Dawson County, Montana, by ownership or by lease, known as the "Richey Place" together with state and private leases and Taylor grazing rights. On March 24, 1976, Murphy entered into a pasture agreement with Redland by virtue of which Redland was to pay $5 per animal unit per month in three payments to graze 1,000 animal units on the Murphy land for a period of 5 months during the 1976 grazing season. The pasture lands apparently included 8 sections of land which Murphy held under lease from one Homer Johnstone which Murphy had leased from Johnstone for a promised cash consideration of $19,000. Murphy had paid $3,000 to Johnstone and the balance of $16,000 he sought to obtain from the Wolf Point PCA by borrowing. The loan from the Wolf Point PCA was to be

based upon the strength of the pasture agreement between Murphy and Redland for the lands. Redland had apparently determined to buy cattle in Texas to stock the lands covered by the pasture agreement.

Before PCA made the proceeds of this loan available, Murphy called Redland to inquire if Murphy could come in on one-third interest of the Texas cows if Murphy could produce a banker who would bankroll the venture for them. He was proposing to Redland that Berthelson would be the financier involved. Redland agreed, and Murphy negotiated with Berthelson.

Berthelson agreed to provide the money to purchase the cattle. He reserved the right to approve the cattle purchase, on which Redland had already negotiated a purchase price, and for which Redland had made a down payment of $10,000. Berthelson further stipulated he would receive one-third of the net profits when the cattle were sold, and in addition, would receive 10 percent interest per annum from the other two parties on any monies which Berthelson advanced on the purchase price of the cattle or the operating expenses of grazing and running the cattle, over and above his one-third share, from the party or parties who contributed less than a one-third share.

Berthelson went to New Mexico in early April 1976, approved the cattle, and provided $158,884.32 towards their purchase, the other $10,000 of the purchase price having come from Redland.

Before shipping the cattle to Montana, however, Redland and Berthelson sold certain of the cattle in Roswell, New Mexico, with the agreement of Murphy, which netted the joint venture the sum of $11,018.76. The remaining cattle were shipped to Montana by truck, Redland paying the trucking expenses.

When the cattle arrived in Montana, it was found that Homer Johnstone had not been paid the balance of the lease monies due him, and refused to allow the cattle to be unloaded on the leased lands until he was paid. As a result, the cattle were unloaded on Murphy's Bluff Creek property. Eventually Johnstone agreed to permit the cattle on his land after receiving a personal guaranty of

payment from Redland and Berthelson. In June 1976, the PCA paid Johnstone the $16,000 balance, as proceeds of a loan from PCA to Murphy.

Before Berthelson had paid the balance of the purchase price for the cattle in New Mexico, a conference long-distance telephone call between Murphy, Redland and Berthelson occurred, whereby orally the essential details of their agreement were worked out. This agreement was reduced to writing, and on June 6, 1976, the parties met in Richey, Montana, where the written agreement was signed. At the same time, they added and approved three handwritten paragraphs to the agreement which were to the effect that Redland would have full charge of the operation of the cattle and all employees and management of all leases; Murphy would furnish Berthelson and Redland with a letter from the PCA office as to any interest PCA might have in the Johnstone lease and what PCA expected of Murphy with regard to the joint venture agreement; and further, Murphy on that date was in violation of their agreement and had been given 10 days to correct the violation.

PCA requested it be given a lien on the cattle as security for its loan to Murphy of $16,000. However the cattle had been branded with the Berthelson brand and he refused to allow the cattle to be mortgaged.

At the June 6 meeting, Berthelson insisted Murphy provide an additional $25,000 toward the venture. Murphy claims the requirement for an additional $25,000 from him was one of the "violations" of the joint venture agreement claimed by Berthelson and Redland, which he was to remedy within ten days. Murphy never produced the $25,000 although oral extensions were given to him by Berthelson. Murphy claims that on July 16, 1976, Berthelson terminated the arrangement as far as Murphy was concerned.

How much Murphy would receive for the grazing of joint venture cattle upon his lands then became a matter of dispute between the parties. Berthelson had advised Murphy he would receive only $3,000 credit, as the remaining $16,000 had come from the PCA.

About September 8, 1976, Murphy learned from Redland that Redland intended to remove the cattle and sell the same though the parties had not arrived at an agreement as to grazing costs to be allowed to Murphy. Murphy filed and served on September 30, 1976, an agister's lien on the cattle under section 45-1106, R.C.M. 1947, claiming the reasonable value of the grazing furnished by him to be $42,730. Murphy claims the calves were removed by Redland from the Johnstone place without Murphy's knowledge or consent to the Valley Vu Feed Lot, Fairview, Montana. Upon learning this, Murphy trailed the remaining cattle from the Johnstone place to his Bluff Creek property. There, Redland came in and removed the remaining cattle, intending to sell them at the Sidney Livestock Auction Company, Sidney, Montana. Murphy filed his complaint in the District Court on October 20, 1976, requesting and obtaining from the District Court a temporary restraining order against the sale of the cattle and praying for $42,730, the amount of his grazing claim against the defendants as damages. However, Redland and Berthelson sold 518 cows, 13 bulls and 47 calves at the Sidney Livestock Market Center on October 20, 1976, for the net sum of $94,969.88. These funds were impounded by the State Brand Inspector because of the agister's lien and the temporary restraining order of the court. An additional 520 calves were held in the Valley Vu Feed Lot.

On October 29, 1976, the parties stipulated if Murphy posted a surety bond in the sum of $20,000 and the defendants, Berthelson and Redland deposited a total sum of $42,730 in a special savings account, subject to the order of the Court, the temporary restraining order could be quashed, the funds from the sale released to E. M. Berthelson and the remaining calves could be sold. Murphy posted a surety bond in that amount provided by Aetna Casualty and Surety Company. Berthelson deposited the $42,730 in the savings account in the First National bank of Glendive, Montana. The remaining cattle were sold, resulting in net proceeds on November 10, 1976 from C & L Cattle Company of $40,168.81 and on November 16, 1976 from Sidney Livestock Market Center the sum of

$44,286.15. With these sales, all of the cattle held by the joint venture had been sold.

Also on October 29, 1976, defendants, Redland and Berthelson, filed an answer and crossclaim, denying in essence the allegations of the plaintiff's complaint and inserting a crossclaim against Murphy claiming the wrongful filing of the agister's lien by Murphy and the procuring of the restraining order issued by the Court resulted in an inability to sell the cattle to such an extent that losses were sustained when the cattle were eventually sold.

The case came on for trial before the District Court beginning February 3, 1977. The trial took on the nature of an accounting between the members of the joint venture and an action for damages against Murphy. The District Court entered its findings of fact and conclusions of law on April 29, 1977. In essence, the Court found the joint venture had sustained an operating loss of $31,912.04; it further found the filing of the lien by Murphy had prevented the ordinary sale of calves by reason of which the joint venture sustained a loss of $16,721.04. It also found that Murphy had prevented the ordinary sale of the remaining calves, cows and bulls resulting in a loss to the joint venture of $25,482.04. The total loss the Court found came to $74,115.12, charging one-third to each member of the venture, or the sum of $24,705.04. Against this sum, the Court credited Gary Murphy with the $19,000 on the cash lease and entered its judgment against Murphy and in favor of Redland and Berthelson in the sum of $5,705.04, and an additional sum of $2,532.05 due to Berthelson as interest for Murphy's unpaid share of cash contributions for the joint venture. The Court provided that the judgment was effective against Murphy and the surety company, Aetna Casualty and Surety Company. All funds theretofore held and the savings account were to be released to Berthelson.

Appeal by Murphy to this Court was timely filed.

The foregoing statement of facts is not complete. We will set forth additional essential facts with respect to the discussion of the issues hereunder.

The plaintiff submits 17 issues for review, mainly relating to findings and conclusions entered by the Court. The issues can be encapsulated as follows:

(1) What were the duties and responsibilities of the members of the joint venture?

(2) Was the venture terminated or repudiated prior to the cattle sale?

(3) Is Murphy liable to Berthelson and Redland for damages?

(4) What is the proper accounting between the parties?

(5) How should interest be awarded?

(6) How should court costs be taxed?

*The Duties and Responsibilities of the Members of the Joint Adventure*

 The parties here were engaged in a "joint enterprise" or "joint adventure", looking eventually to their mutual gain. As this Court stated in *Bradbury v. Nagelhus, et al.* (1957), 132 Mont. 417, 426, 319 P.2d 503, 509:

"Broadly speaking, a joint adventure may be characterized as a quasi-partnership in a single adventure undertaken for mutual gain. The terms joint adventure and joint venture are synonymous. 48 C.J.S. Joint Adventures § 1, p. 803. If the venture be for pleasure rather than profit, it is sometimes called a joint enterprise.

"These relations differ technically but assume one element common to all. *Inter se*, partners are agents and principals. Trustees are agents for the beneficiaries, but beneficiaries are not agents for their trustees. A court of equity will raise a constructive trust to sustain a joint venture, but not alone to enforce a copartnership. Joint adventures and joint enterprises are defined on principles applicable to partnerships. *Inter se*, partners and joint adventures are obligated as trustees. The common element is the fiduciary relation."

As between themselves, the members of a joint adventure are principals for themselves and as to the other members, are agents. Thus, they undertake a dual status, at the same time, that of princi-

pal and that of agent. 48 C.J.S. Joint Adventures § 5c, p. 827. Since a mutual agency exists, each has the right of control over the others and an equal right to a voice in performing the joint adventure as well as in controlling the agencies used in its performance. 48 C.J.S. p. 828, supra. However, one or more members of the joint adventure may entrust certain performances of the enterprise to one or more of the other members. 48 C.J.S. p. 828, supra.

 The joint adventurers may provide in their agreement, that if default occurs with respect to one of the members, the other members may succeed to his interest upon such default. *Adams v. McGraw* (1924) 99 Okl. 65, 225 P. 980. However, absent a default agreement joint adventurers cannot forfeit the rights of a member and exclude him from participation in the enterprise because he is in default. 48 C.J.S. p. 833, supra. In that case, the remedy of the joint adventurer who is not in default is an action for rescission or for breach of contract.

From the evidence here, we find that the members, Richard Redland, E. M. Berthelson and Gary M. Murphy entered into an oral agreement of joint adventure or joint enterprise (later partly reduced to writing, and amended from time to time), whereby the parties agreed to purchase cattle in Texas, ship them to Montana, graze and run them on lands owned or leased by Murphy, each to pay one-third of the cost and expenses involved and to share one-third in the profits, if any resulted.

The total cost of the cattle purchased was $168,844.32. Of this amount, Redland had already paid $10,000 as a down payment, and Berthelson supplied the balance. The written agreement provided if one of the parties bore more than his share of the purchase price of the cattle, or the "operating expenses of grazing and running the cattle" then any party not paying or bearing his share of the cost shall be liable to and would owe the party bearing more than his share of the cost the difference between the amount so paid by the party bearing the cost and the amount which the other parties should have to bear according to the terms of the agreement, with interest at 10 percent per annum. Having bankrolled the

cattle purchase, Berthelson had no further specific duties under the written agreement. It was the duty of Redland and Murphy properly to feed and care for the livestock and their offspring according to the standard of good husbandry.

The written agreement provided that in the event of dispute the problems were to be settled by arbitration. Not treated in the agreement, however, were these important subjects:

(a) What amount Murphy would be entitled to receive for his pasture; and,

(b) Whether less than all of the members of the co-adventure could act to sell the cattle, or any part thereof, without the other member's knowledge or consent.

*The Termination or Repudiation of the Contract*

Murphy claims that as to himself, the contract was "repudiated" and terminated by Berthelson and that as a result, he was forced out of the joint venture. The significance of this claim is, since the cattle were being held by the co-adventurers in a falling cattle market, during the early term of the agreement it would be advantageous to Berthelson and Redland and not advantageous to Murphy to have Murphy out of the arrangement and not share in the profits; whereas, at the time the cattle were sold, it was advantageous to Berthelson and Redland and not advantageous to Murphy to have Murphy included as a joint adventurer, because then he shared the losses.

There is some ground to Murphy's claim. As indicated, the parties met in Richey, on June 6, 1976. At that time, it appeared Murphy's loan from the PCA had not come through and so the Johnstone-lease remained unpaid; also on that date, Berthelson required Murphy provide an additional $25,000 as a cash contribution to the joint venture. These problems brought about two written amendments to the partnership agreement: one, where Murphy agreed to furnish Berthelson and Redland a letter from the PCA office as to whether PCA was claiming any interest in the cattle and also that Murphy on June 6, 1976, was in violation of the joint enterprise agreement and was given ten days to cure viola-

tion. He was later given oral extensions of the ten days to July 7, 1976. Murphy claims he was given to understand, because he did not provide such $25,000 cash contribution, that he was in fact out of the joint adventure.

On the other hand, Berthelson and Redland deny Murphy was forced out of the joint adventure by them. They stated the written provisions were simply for the purpose of requiring Murphy to provide the cash contributions he had agreed to provide and Murphy was never given actual notice, in writing or otherwise, that his interest in the joint venture was terminated. It is not clear that Murphy himself ever consented he was indeed out of the joint venture.

A contract may be terminated by the parties, but only by the mutual consent of all the parties. *Edwards v. Muri* (1925), 73 Mont. 339, 346, 237 P. 209, 211. The parties could have ended the contract by proceeding for rescission, section 13-905, R.C.M. 1947. None of these events occurred however and so we hold the contract was not terminated, extinguished, rescinded, or "repudiated" and that Murphy was at all times a fully participating member of the joint adventure.

*Murphy's Liability for Damages*

The District Court found that Murphy caused a loss to the joint enterprise of $16,721.04 resulting from the sale of calves by the joint enterprise, and the further sum of $25,482.04 resulting from the ordinary sale of calves, cows and bulls. With these conclusions we do not agree.

Some further discussion of the facts is necessary to understand this issue. At the meeting of the members in Richey, on June 6, 1976, a further written amendment to the written agreement was made whereby Redland was to have full charge of the operation of the cattle, all employees and management of all the leases. Thereafter, Redland, to the exclusion of Murphy, took over managing the cattle, and the payment of expenses incurred thereby.

The cattle continued to be pastured on the Johnstone lease. In September 1976, Redland asked Murphy, in a telephone conversa-

tion, to send Redland a letter stating what Murphy thought he was entitled to for the cost of pasturing the enterprise cattle. Murphy declined to do this. At the same time, however, he learned that Redland, with the agreement of Berthelson, intended to remove the cattle from the Johnstone lease and offer them for sale. One of the unwritten agreements between the members of the coadventure was when the cattle came to Montana, they would be branded with Berthelson's brand. Against the possibility that the cattle could be sold by Berthelson and Redland without Murphy's knowledge and consent, and without an agreement with respect to his pasture monies, Murphy, on September 30, 1976, filed an agister's lien, claiming the sum of $42,732 for grazing. He had computed the sum on a basis of $10 per head per month for all livestock older than 6 months and $5 per head per month for calves of 6 months or less.

An additional factor was that these were Texas cattle, where cows are calved the year round and not, as is common in Montana, programmed to yield calves in the late winter or early spring months. The calves which the cows had already produced had shown a "phenomenal" performance, averaging 492 pounds at the time of weaning. An additional number of the cows were pregnant and likely to calve in late 1976 or early January 1977. Redland, who had in the meantime leased other pasture land in Texas, wanted to buy the joint enterprise cattle for himself to use in stocking his newly acquired Texas leases. He conferred with Berthelson and agreed with Berthelson that he would meet any offer for the livestock up to $225 per head. None of this plan to purchase from the joint enterprise by Redland was confided to Murphy or to his attorney. Redland did however tell Murphy he intended to sell the cattle through the sales ring at the Sidney Livestock Market Center in Sidney, Montana, so Murphy "could protect himself" if Murphy desired to compete for the cattle. Because of the agister's lien, however, the livestock inspector at Sidney refused to inspect the cattle proposed for sale and Redland was informed before the sale that any proceeds would be impounded pending disposition of the lien. Redland claims this prevented his purchase of the cattle (it is not

clear from the record why Redland did not go ahead with the purchase by dealing privately with Berthelson, subject to the lien claim of $42,732). Eventually, the cattle were sold through the sales ring for a lesser sum. The loss of $25,482.04 found by the Court to have been sustained by the joint adventure results from the difference between what Redland testified he would have paid for the cattle and the amount actually realized through the sales ring.

In the same manner, Redland had earlier agreed to sell some of the calves belonging to the joint enterprise to C & L Cattle Company for an agreed price. The presence of the agister's lien also prevented that sale and when the cows were later sold, the loss sustained by the joint venture was $16,721.04. Again with respect to the calves, nothing of the proposed sale to C & L Cattle Company by Redland was divulged to Murphy, who was entitled to an equal worth on that decision. 48 C.J.S. p. 828, supra.

Here the duty that one member of a joint enterprise owes to the other members comes into play. Redland had a duty, as to Murphy, to exercise the utmost good faith in his handling of the joint enterprise property. He is held strictly to account for the management of the same. He is not permitted, by reason of his possession of the property or the right to manage the same to enjoy an unfair advantage, nor to have any greater rights in the property or profit therefrom, than his coadventurers were entitled to. *McIver v. Norman* (1949), 187 Or. 516, 213 P.2d 144, 149. He had a duty to keep his coadventurers fully informed. See, *Bradbury v. Nagelhus*, supra.

His duty is of such a high degree that Judge Cardozo was led to say in *Meinhard v. Salmon* (1928), 249 N.W. 458, 164 N.E. 545, 546, 547, 62 A.L.R. 1, the following:

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market

place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this, there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exception. (Citing case.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

"* * *.

"* * * The very fact that Salmon was in control with exclusive powers of direction charged him the more obviously with the duty of disclosure, since only through disclosure could opportunities be equalized * * *. He might steal a march on his comrade under cover of the darkness, and then hold the captured ground. Loyalty and comradeship are not so easily abjured."

 Here the contracts on which the District Court found the damage figure (eventually assessed one-third to Murphy) were contracts that Redland was powerless to make unless he fully divulged the facts to his co-enterpriser, and obtained his consent. We hold that damages cannot be claimed from Murphy on aborted contracts resulting from Redland's failures as a managing joint adventurer.

In like manner, the contract for the sale of calves to C & L Cattle Company must likewise be disregarded as a base for damages and we so hold.

██ Equity will refuse to aid a party whose claims had their inception in his own wrongdoing, whether the victim of the wrongdoing is the other party or a third party. *Oliphant v. French* (1970), 256 Or. 341, 472 P.2d 275, 278.

Our refusal to recognize such damages necessitates a recomputation of the accounting between the parties, which we will discuss under the next caption.

*A Proper Accounting Between the Co-Adventurers*

The method adopted by the District Court in its findings and con-

clusions, to determine the judgment against Murphy, was to compute the losses of the joint venture, add to that the purported losses from the cattle sales, divide the total of those sums by one-third, subtract $19,000 from that result and the balance was the amount the District Court determined Murphy owed.

A proper method of determining an account between co-adventurers is set out in 48 C.J.S. Joint Adventures § 11d, p. 843. There it is stated:

"In ascertaining profits, from the gross receipts from the business must first be deducted the original capital invested by the members, the value of any tangible property put into the enterprise, and any loans and advances made by any of the members; and each member must be given the proper credit for the amount contributed by him * * *."

In determining an accounting in this case, the first difficulty encountered is what should be allowed to Murphy for the pasture which he supplied to the joint enterprise. While it is clear from the evidence that the cattle were pastured on lands either leased or owned by him, it is unclear that there was any specific agreement between the parties as to the amount that Murphy was to receive for his pasture. The only specific item of cost to him that can readily be determined from the record is the cost of the Johnstone lease, the sum of $19,000. Very probably, considering the number of cattle pastured, and the length of time the cows were on his pasture, he should be entitled to more money for that item. There is however no evidence upon which the District Court or we can determine a larger amount.

If we consider the cost of the grazing lease to be a capital investment by Murphy, the capital investments of the members of the joint enterprise are reflected as follows:

Capital Investments by Joint Venturers:

Cost of Cattle:

| | |
|---|---:|
| April 1976—Redland | $ 10,000.00 |
| April 1976—Berthelson | 158,844.32 |
| | $168,844.32 |

Cost of Lease:

April-June 1976—Murphy . . . . . . . . . . . . . . . . . . . . 19,000.00
Total Capital Investment . . . . . . . . . . . . . . . . . . . .$187,844.32

To determine the profit or loss of the joint enterprise is not diffi-
cult. It is a matter of adding up the net receipts on the sale of cattle,
and then totaling the costs incurred by the members of the joint
enterprise to determine whether there was a profit or loss. In the
computation below, we have accepted in full the amounts claimed
by Redland through his Exhibit G, although some items in that ex-
hibit are questionable, particularly the charge for his attorney fees.
However, the District Court accepted the same, as it accepted the
expenses claimed by Berthelson. With those figures, we determine
the profit (loss) of the joint enterprise as follows:

Total Sales Receipts (Net):

| | |
|---|---:|
| April 30, 1976—Roswell, New Mexico bull sale . | $ 11,018.26 |
| November 3, 1976—Sidney Livestock Auction . . | 94,969.88 |
| November 10, 1976—C & L Cattle Co. . . . . . . . . | 40,168.81 |
| November 16, 1976—Sidney Livestock Auction . | 44,286.15 |
| Total Receipts . . . . . . . . . . . . . . . . . . . . . . . . . . . | $190,443.10 |

Total Outgo:

| | |
|---|---:|
| Cost of Cattle . . . . . . . . . . . . . . . . | $168,844.32 |
| Cost of Lease . . . . . . . . . . . . . . . . | 19,000.00 |

Total Outgo:

| | |
|---|---:|
| Redland expenses . . . . . . . . . . . . . . | $ 33,481.82 |
| Berthelson expenses . . . . . . . . . . . . . . | 928.31 |
| | $222,254.45 |
| Profit (Loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($31,811.35) |
| One-Third to each joint venturer . . . . . . . . . . . . . | ($10,603.78) + |

Since the coadventure had total receipts of $190,443.10, and sus-
tained a loss of $31,811.35, it follows that there remains the sum of
$156,032.97 for distribution. This should have been distributed to
the members of the coadventure as follows:

## Final Capital Accounts of Joint Venturers:

| Murphy | Redland | Berthelson | Total |
|---|---|---|---|
| $19,000.00 | $10,000.00 | $158,844.32 | $187,844.32 |
| (10,603.79) | (10,603.78) | (10,603.78) | (31,811.35) |
| $ 8,396.21 | $ (603.78) | $148,240.54 | $156,032.97 |

Since the joint venture received a total cash amount of $190,443.10, this should be distributed to the members in reimbursement of their expenses and of their capital accounts, after taking into consideration the loss incurred by the joint adventure. Accordingly, the final cash distribution between the parties should be as follows:

## Final Cash Distribution to Members:

| | Capital | Expenses | Total |
|---|---|---|---|
| Murphy | 8,396.21 | 0 | 8,396.21 |
| Redland | (603.78) | 33,481.82 | 32,878.04 |
| Berthelson | 148,240.54 | 928.31 | 149,168.85 |
| | 156,032.97 | 34,410.13 | 190,443.10 |

Since Berthelson is holding the cash proceeds from the sale of the cattle, we hold and conclude that Murphy is entitled to receive from him the sum of $8,396.21, subject however, to the interest which Murphy may owe to Berthelson, a subject which we next discuss.

*The Interest Award:*

The written agreement provides, as we have indicated, that if one of the members contributed more than his just share of the capital to the joint adventure, he would be entitled to receive interest at the rate of 10 percent per annum from the partner or partners who were deficient in their contribution of capital.

The District Court, in its findings, determined that Murphy owed Berthelson the sum of $2,532.05, but computed from the 29th day of October, 1976 to February 4, 1977.

This is the computation submitted by Berthelson during the time of the trial, but it is patently in error, Berthelson is entitled to receive interest from the date he paid for the cattle, April 10, 1976, to the time when he received the monies from the cattle sales, the last day of which we determine to be November 16, 1976. From and after that time, Berthelson had the money in his hands and it is inequitable to charge Murphy for interest, especially when Murphy is entitled to a cash distribution when a final balance is struck between the members.

We compute the amounts contributed and what should have been contributed in capital as follows:

| | Murphy | Redland | Berthelson | Total |
|---|---|---|---|---|
| Capital Contributed . | 19,000.00 | 10,000.00 | 158,844.32 | 187,844.32 |
| One-Third Each ...... | (62,614.77) | (62,614.77) | (62,614.78) | (187,844.32) |
| | (43,614.77) | (52,614.77) | 96,229.54 | 0 |

Accordingly, Berthelson is entitled to charge Murphy interest on the sum of $43,614.77 at the rate of 10 percent per annum for 220 days beginning April 10, 1976 and ending November 16, 1976. That will result in a sum slightly larger than awarded by the District Court, but it is the proper way to compute the interest amount due to Berthelson. The resulting sum is $2,628.84.

The above figures do not determine what Redland owes Berthelson by way of interest, because Redland was contributing expenses toward the operation of the joint venture from time to time. However, there is not any dispute before us as between Redland and Berthelson with respect to this co-adventure.

In deciding the foregoing, we have set aside in some instances what the District Court found. We have viewed this case as one sounding in accounting between the members of the joint venture, a proceeding equitable in nature. That is how the matter was handled in the District Court. In such a case, this Court has the power to make determinations as we have provided above. In section 93-216, R.C.M.1947, it is provided in part:

"* * * in equity cases, and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered. * * *"

We see no reason to remand this cause for a new trial. Accordingly, we return the cause to the District Court with instruction to enter judgment as between the parties in accordance with the provisions herein set forth. In our view, the appellant is the prevailing party and shall receive his costs on appeal.

Reversed and remanded with instructions.

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY, HARRISON and SHEA concur.