No. 14817

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

ROUNDUP CATTLE FEEDERS,

Plaintiff and Appellant,

vs.

FRED HORPESTAD,

Defendant and Respondent.

---

Appeal from:   District Court of the Fourteenth Judicial,
               Honorable Nat Allen, Judge presiding.

Counsel of Record:

For Appellant:

Towe, Ball, Enright and Mackey, Billings, Montana
Stephen Mackey argued, Billings, Montana

For Respondent:

Ask and Pratt, Roundup, Montana
Thomas M. Ask argued, Roundup, Montana

---

Submitted:   November 5, 1979

Decided: DEC 13 1979

Filed: DEC 13 1979

_Thomas J. Kearney_
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

This appeal is from a judgment and award of damages in favor of defendant-cross complainant Fred Horpestad. Trial was in the District Court of Musselshell County, the Honorable Nat Allen presiding without a jury.

On February 11, 1974, Horpestad, a rancher, entered a joint venture agreement with Roundup Cattle Feeders, Inc. (RCF), a feedlot operator. The agreement provided that Horpestad would deliver cattle to RCF at its Roundup, Montana, feedlot. RCF was then to feed and prepare the cattle for market. Upon sale of the fattened cattle, each party was to recover its investment and then split the profits. The agreement, in pertinent part, reads:

> "2. [RCF] agrees to feed and care for said livestock for the periods as hereinafter specified.
>
> " . . .
>
> "The cattle will be fed for a minimum of 120 days from the respective dates they were delivered at said feedlot and thereafter until at least 80% of each respective lot will grade choice.
>
> " . . .
>
> "4. The cattle feeding project shall be deemed a joint venture whereby the parties will share in the profits or losses, in accordance with the following provisions:
>
> "(a) [Horpestad] will have contributed the livestock with agreed values as above set forth for the purposes of this agreement which will constitute [Horpestad's] investment in the enterprise.
>
> "[RCF] will advance the actual cost of feed, veterinary services, yardage, work and labor, and keep a record of these charges, the total of which will constitute in dollars [RCF's] investment in said enterprise.
>
> "(b) When said livestock are sold as fat cattle . . . the net proceeds received from the sale of [cattle] will be remitted to [Horpestad] by the packers, but are to be accounted for between [Horpestad] and [RCF] in accordance with the following formula:
>
> "If the proceeds from the sale of the [cattle] are sufficient so that [Horpestad] may be reimbursed for the agreed in-value of the animals and [RCF]

- 1 -

may be reimbursed for its feeding costs, the balance shall be considered the profit on the transaction and shall be divided equally between the parties.

"However, in the event the net proceeds of sale of said [cattle] to a packer are not sufficient so that [Horpestad] can be reimbursed in full for the agreed in-value thereof, and [RCF] cannot be reimbursed in full for its feeding costs thereof, then and in that event the total agreed in-value of the animals and [RCF's] total feeding costs shall be added together, the net proceeds subtracted therefrom and the balance which would constitute the loss, shall be divided equally between the parties, whereupon one-half the loss would be deducted from [Horpestad's] in-value of the animals and the balance of the cost of the animals remitted to [Horpestad] and one-half of the loss would be deducted from [RCF's] feeding costs for said cattle and the balance of the feeding costs remitted to [RCF].

" . . .

"5. [RCF] represents that it has made adequate and suitable arrangements so that it can provide the necessary feed, labor and equipment to properly care for said cattle."

As per the contract, Horpestad delivered the cattle and RCF began feeding them. Unfortunately, cattle prices plummeted during the first half of 1974. As a result, RCF lost its bank financing and could not provide feed for the cattle. Being unable to perform its contractual obligation, RCF informed Horpestad he would have to provide the necessary feed or remove the cattle.

On May 31, 1974, RCF fed the cattle dry hay instead of silage along with their regular grain and supplement. This took the cattle off their feed at a critical time and set their weight back drastically. On June 1, Horpestad terminated the contract and removed his cattle to a yard in Powell, Wyoming. RCF agrees the joint venture ended on this date. As a result of the move to Powell, the cattle were further taken off their feed and their progress was set back even more.

Because the cattle had been removed from their feed, they had to be fed longer in order for 80% of them to grade choice. They were fed at the Powell, Wyoming, feedlot until they were sold in mid-September, 1974.

Between February 11 and June 1, 1974, RCF expended $57,872.66 for feed and labor. It was never reimbursed for this amount. RCF sought an accounting as of the date the joint venture was terminated or, in the alternative, restitution. Horpestad counterclaimed for damages in the amount of the expenses incurred in moving the cattle and feeding them to make up for the time they were off their feed. RCF was denied relief on both its claims but Horpestad's counterclaim was allowed in the amount of $27,347.

RCF appeals and raises the following issues:

1. Whether an accounting must be made.

2. Whether RCF is entitled to restitution.

3. Whether the award of damages was proper.

The theory underlying RCF's claim for an accounting is that it is entitled either contractually or equitably to the money it expended in performing as much of the contract as it did. To this end we must first determine whether the contract was entire or severable.

The rule upon which the question is resolved has been stated as follows:

> " . . . Whether a contract is entire or divisible depends very largely on its terms and on the intention of the parties disclosed by its terms. As a general rule a contract is entire when by its terms, nature and purpose, it contemplates and intends that each and all of its parts are interdependent and common to one another and to the consideration . . ." Traiman v. Rappaport (3rd Cir. 1930), 41 F.2d 336, 338; Purdin v. Westwood Ranch and Livestock Co. (1923), 67 Mont. 553, 557, 216 P. 326, 327.

The contract here provided that RCF was to feed the cattle until 80% graded choice. Only after this was achieved were the cattle to be sold and the proceeds from the sale split between the joint venturers. It is clear the parties intended the contract to be entire and nonseverable. Complete performance was required of RCF until the desired weight gain was accomplished; partial

performance could not satisfy its contractual obligation.

RCF, by defaulting on its obligation and abandoning the contract completely frustrated the purpose, intent and terms of the joint venture agreement. It thereby forfeited any right it may have had to an accounting under the contract. Brooks v. Muth (1956), 144 Cal.App.2d 560, 301 P.2d 404, 408. The instant case is distinguishable from Murphy v. Redland (1978), ____Mont.____, 583 P.2d 1049, 1053, 35 St.Rep. 1267, 1272, wherein we said, "[A]bsent a default agreement joint adventurers cannot forfeit the rights of a member and exclude him from participation in the enterprise because he is in default." In Murphy, the joint venture was never terminated and the party seeking an accounting remained a fully participating venturer. Here, the complaining party agrees the joint venture was terminated by its own abandonment.

Even though its own wrong destroyed the joint venture, RCF attempts to invoke the court's equity power to order an accounting. The contention fails as equity is premised on the notion that a wrongdoer may not take advantage of his own wrong. Mitchell v. Pestal (1949), 123 Mont. 142, 150, 208 P.2d 807, 811; section 1-3-208, MCA. In a case similar to the one at bar, the Washington Supreme Court said:

> "Appellants did not offer to do equity in their complaint. It seems strange, indeed, that suitors, admitting their breach of a joint venture contract, should seek the aid of the court of equity to enforce rights claimed by them under the identical contract. No one may profit by his own wrong. It seems to us that by their own admitted misconduct appellants forfeited any rights to an accounting." Saletic v. Stamnes (1958), 51 Wash.2d 696, 321 P.2d 547, 549.

RCF argues its performance became impossible because of the drop in cattle prices which caused it to lose its financing. It concludes it was thus excused from performing under the doctrine of commercial impossibility. We cannot agree for two reasons. First, in order for commercial impossibility to excuse performance of a contract, the parties thereto must have no reason to forsee

- 4 -

the impossibility at the time they contracted. Rest. Contracts, section 456; Smith v. Zepp (1977), 173 Mont. 358, 567 P.2d 923, 927-928 34 St.Rep. 753, 758-759. Here, fluctuation in cattle prices is a fact of life--it is forseeable. Second, in order for commercial impossibility to excuse performance, the contractual duties must be impossible for anyone to perform. Rest. Contracts, section 455; Marshick v. Marshick (1976), 25 Ariz.App. 588, 545 P.2d 436, 439; Cannon v. Huhndorf (1966), 67 Wash.2d 778, 409 P.2d 865, 867. As stated in 17 Am Jur 2d Contracts, §415:

> "It is generally well settled that the subjective impossibility, that is, an impossibility that is personal to the promisor and does not inhere to the nature of the act to be performed, does not excuse nonperformance of a contractual obligation. Accordingly, the fact that one is unable to perform a contract because of his inability to obtain money, whether due to his poverty, a financial panic, or failure of a third person on whom he relies for furnishing the money, will not ordinarily excuse nonperformance, in the absence of a contract provision in that regard."

The impossibility in this case was personal to RCF. This fact is illustrated by Horpestad's obtaining adequate financing once the cattle were moved.

We turn next to RCF's argument that it is entitled to restitution of the expenses it incurred in partially performing the contract. As discussed, the agreement was entire and nonseverable; failing in the complete performance of such a contract, RCF cannot recover thereunder. Being a plaintiff in substantial default and without a remedy under the contract, RCF's argument for restitution is necessarily based on an implied contract under which it seeks to recover a benefit conferred on a nondefaulting defendant. It contends if the benefit (less damages caused by its breach) is not returned, Horpestad will be unjustly enriched. We disagree.

The rule allowing restitution in some cases is said to be grounded on principles of equity. As such, the party seeking

- 5 -

restitution cannot base its claim on its own willful breach of an entire contract. Mitchell v. Pestal, supra, holding that a wrongdoer may not take advantage of its own wrongdoing; section 1-3-208, MCA.

In order for a claim of restitution to lie:

"'There must be no willful or intentional departure, and the defects must not pervade the whole, or be so essential as that the object which the parties intended to accomplish--to have a specified amount of work performed in a particular manner is not accomplished.' [Citations omitted.] To permit a plaintiff to recover though it appears that he has willfully disregarded his engagement in essential particulars, would be for the law to encourage parties to be delinquent in the performance of their solemn engagements; whereas its policy is to compel observance of them." Waite v. C. E. Shoemaker & Co. (1915), 50 Mont. 264, 278, 146 P. 736, 739; see also Harris v. The Cecil N. Bean (2nd Cir. 1952), 197 F.2d 919; Hayeck Building & Realty Co. v. Turcotte (1972), 361 Mass. 785, 282 N.E.2d 907; McLeod v. Belvedale (1967), 115 Ga.App. 444, 154 S.E.2d 756; Jones & Laughlin Steel Co. v. Abner Doble Co. (1912), 162 Cal. 497, 123 P. 290.

A workable composite of the above cited authorities is that a party who has completely breached an entire, nonserverable contract, without justification or excuse, may not recover for any performance rendered prior to the breach. Here, RCF expressly represented it had "made adequate and suitable arrangement so that it can provide the necessary feed, labor and equipment to properly care for said cattle." The drop in cattle prices, which was a forseeable event, caused RCF to lose its financing. Here RCF had not made suitable arrangements in accord with its promises. There is no justification or excuse. No restitution can be allowed.

The award of damages to Horpestad on his counterclaim will not be disturbed. The object of a damage award is to recompense the aggrieved party for detriment suffered as a proximate result of a breach of contract. Section 27-1-311, MCA. The evidence indicates that RCF's breach caused the cattle to be moved and to be fed for thirty extra days. The award for expenses incurred in

moving and in the extra feeding was proper.  The award covered nothing but costs incurred as a result of RCF's breach.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

- 7 -