FILED

10/11/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0100

DA 16-0100

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 257

GABRIEL PEARSON,

        Plaintiff and Appellant,

    v.

BERNICE MCPHILLIPS and JAMES
RAULSTON,

        Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Ninth Judicial District,<br>In and For the County of Toole, Cause No. DV-14-035<br>Honorable Robert G. Olson, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

            Kirk D. Evenson, Marra, Evenson & Bell, P.C., Great Falls, Montana

        For Appellee:

            Joseph M. Sullivan, Sullivan Law, Great Falls, Montana

                        Submitted on Briefs:  August 24, 2016

                                    Decided:  October 11, 2016

Filed:

_____

                    Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1      Gabriel Pearson appeals an order of the Ninth Judicial District Court, Toole County, granting summary judgment to Bernice McPhillips and relieving her of liability for a fire James Raulston started while cutting scrap metal on McPhillips' property. We address:

> *1. Whether the District Court erred in finding that McPhillips and Raulston were not engaged in a joint venture.*
>
> *2. Whether the District Court erred in finding that using a cutting torch is not an inherently dangerous activity.*

¶2      We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3      In early 2012, Raulston started a scrap metal business, whereby he collected scrap metal from landowners in Toole County, Montana, and sold it. Raulston approached several landowners to discuss removing scrap metal from their property; some permitted him to do so and others did not. In February 2012, Raulston approached Scott O'Brien, McPhillips' son-in-law, who helps McPhillips manage her property. Raulston asked O'Brien if he could remove scrap metal from McPhillips' property and sell it. On behalf of McPhillips, O'Brien gave Raulston permission to remove the scrap metal, in addition to several "old junk vehicles" from McPhillips' property that Raulston claimed were previously owned by one of his relatives. O'Brien agreed on the condition that Raulston give him thirty-five percent of the proceeds from the sale of the scrap metal. O'Brien provided Raulston with a map of the property and wrote the basic terms of the parties' agreement on the map, including:  "Jim Ra[u]lston in a white flatbed truck has

permission to pick up scrap in the yellow areas <u>only</u>;" and "[t]he split for the scrap is 65% Jim 35% Scott on Gross Sales + Receipts provided." (Emphasis in original.) Two areas on the map are highlighted in yellow.

¶4 According to his affidavit, Raulston chose the days and hours he worked; who, if anyone, worked with him; and the method and manner of removing the scrap metal. He did not seek McPhillips' approval or permission for these actions. Raulston did not contract with O'Brien or McPhillips for any compensation other than sixty-five percent of the proceeds from the sale of the scrap metal. He used his own equipment and tools. Both Raulston and O'Brien testified via affidavit that they never considered Raulston to be an employee of McPhillips or O'Brien. Raulston operated in a similar manner with other landowners in the area who, according to their affidavits, understood Raulston "to be an independent business person agreeing . . . to perform work of removal of scrap" from their property.

¶5 In March 2012, Raulston was using a cutting torch to cut scrap metal on McPhillips' property when an errant spark from the torch started a grass fire that he was unable to immediately contain. The fire spread, burning several structures and a variety of equipment on Pearson's property. Pearson filed a complaint against both Raulston and McPhillips, alleging that Raulston was "acting as an agent, servant, or employee" of McPhillips when he started the fire. McPhillips filed a motion for summary judgment, contending that she should be dismissed from the case because Pearson was unable to show that McPhillips was vicariously liable for Raulston's actions. The District Court agreed and granted summary judgment to McPhillips, holding that McPhillips was not

vicariously liable for Raulston's actions because: (1) McPhillips and Raulston did not enter into a joint venture; (2) Raulston was an independent contractor; and (3) Raulston's use of a cutting torch on the scrap metal was not an inherently dangerous activity. Pearson appeals the District Court's decision, contending that the agreement between Raulston and O'Brien created a joint venture and that Raulston's use of a torch was an inherently dangerous activity.

## STANDARDS OF REVIEW

¶6      We review summary judgment orders de novo, applying the same criteria as the district court, set forth in M. R. Civ. P. 56. *Rich v. Ellingson*, 2007 MT 346, ¶ 12, 340 Mont. 285, 174 P.3d 491. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). The moving party has the initial burden of establishing these requirements. *Rich*, ¶ 12. Once the moving party has met this burden, "the opposing party must present substantial evidence essential to one or more elements of its case in order to raise a genuine issue of material fact." *Rich*, ¶ 12. A district court's interpretation of a contract is a matter of law, which we review for correctness. *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 21, 306 Mont. 321, 34 P.3d 87.

## DISCUSSION

¶7      *1. Whether the District Court erred in finding that McPhillips and Raulston were not engaged in a joint venture.*

¶8      "A joint venture is an 'association of two or more persons to carry on a single business enterprise for profit.'" *Brookins v. Mote*, 2012 MT 283, ¶ 43, 367 Mont. 193,

292 P.3d 347 (quoting *Sunbird Aviation, Inc. v. Anderson*, 200 Mont. 438, 444, 651 P.2d 622, 625 (1982)). To qualify as joint venturers, the parties must have: (1) an express or implied agreement or contract creating a joint venture; (2) a common purpose; (3) community of interest; and (4) an equal right to control the venture. *Brookins*, ¶ 43. Under the first element, the parties' intent is crucial to determining whether a joint venture exists. *See Rae v. Cameron*, 112 Mont. 159, 168, 114 P.2d 1060, 1064 (1941) ("As between the parties themselves, the relationship of joint adventurers is a matter of intent, and arises only where they intend to associate themselves as such.") (citation omitted).

¶9     We determine whether parties to an agreement intended to create a joint venture "in accordance with the ordinary rules governing the interpretation and construction of contracts." *Rae*, 112 Mont. at 168, 114 P.2d at 1064 (citation omitted). "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ." Section 28-3-301, MCA. When a contract is in writing, "the intention of the parties is to be ascertained from the writing alone if possible." Section 28-3-303, MCA. However, "where intent cannot be directly ascertained, it must be established from all the facts, circumstances, actions, and conduct of the parties." *MacArthur Co. v. Stein*, 282 Mont. 85, 90, 934 P.2d 214, 217 (1997) (citation omitted); *accord Bender v. Bender*, 144 Mont. 470, 480, 397 P.2d 957, 962 (1965) (holding that, to establish a joint venture or partnership, "[t]he intention of the parties has to be clearly manifested, and must be ascertained from all the facts and circumstances and the actions and conduct of the parties") (citations omitted).

¶10 The District Court noted, and Pearson concedes on appeal, that Raulston and McPhillips did not expressly create a joint venture. The District Court thus considered the "facts, circumstances, actions, and conduct of the parties." *MacArthur Co.*, 282 Mont. at 90, 934 P.2d at 217. The Court found that, while McPhillips dictated where on her property Raulston could go, Raulston used his own equipment and chose the days and hours he worked; who, if anyone, worked with him; and the methods he used. The District Court also considered affidavits submitted by Raulston, O'Brien, and several other landowners who entered into similar agreements with Raulston, all of whom believed Raulston was an "independent business person" removing scrap metal from the landowners' property in exchange for a portion of the proceeds. Based on these facts, and the lack of evidence to rebut them, the District Court found: "There is no evidence . . . suggesting intention on either the part of McPhillips or Raulston to create a joint venture."

¶11 In his opening brief, Pearson states that "an agreement can be implied," suggesting that the District Court erred in not finding an implied agreement to create a joint venture. Pearson cites no evidence and provides no argument that the parties in this case implicitly agreed to enter into a joint venture. In his opposition to McPhillips' motion for summary judgment, Pearson argued that McPhillips and Raulston entered into a joint venture because:

> McPhillips obviously contributed the real property and the scrap metal to the joint venture and in exchange therefore, was to receive 35% of the proceeds from salvaging the metal. Specifically, McPhillips stated in her brief, "[t]o the contrary, Raulston came to Bernice McPhillips, via Scott

O'Brien, and sought permission to remove scrap metal from her property **in exchange for his payment to her of a fee.**"

(Emphasis in original.) By this logic, a customer who removes an item from a store after providing payment to the store is entering into a joint venture with the store-owner. The only difference between the store scenario and the parties' agreement in this case is that Raulston's payment for the items in question was derived via a percentage of the proceeds from the scrap metal. Notably, Pearson does not expressly contend that the parties' shared profit in itself was sufficient to establish intent; nonetheless, we note that while profit sharing may be persuasive evidence of a joint venture, it does not conclusively establish one. *See Antonick v. Jones*, 236 Mont. 279, 287, 769 P.2d 1240, 1244 (1989) ("[E]ven if the parties were sharing profits, this is not conclusive evidence of a partnership relationship."); *Decker Coal Co. v. Commonwealth Edison Co.*, 220 Mont. 251, 253-54, 714 P.2d 155, 156 (1986) ("[U]nder Montana law a joint venture . . . is treated like a partnership.") (citation omitted).

¶12 The parties do not dispute the material facts regarding their relationship. Although the Dissent cites our statement in *Murphy v. Redland*, 178 Mont. 296, 303, 583 P.2d 1049, 1053 (1978), that a joint venture is "a quasi-partnership in a single adventure undertaken for mutual gain," Dissent, ¶ 21, we further stated in *Murphy* that each joint venturer must have "the right of control over the others and an equal right to a voice in performing the joint venture as well as in controlling the agencies used in its performance," *Murphy*, 178 Mont. at 304, 583 P.2d at 1053. McPhillips dictated the areas of her property from which Raulston could collect scrap metal but had no control

over the equipment he used, the days and hours he worked, or the methods he used. Thus, McPhillips did not have an equal right to a voice in controlling the agencies Raulston used in his performance.

¶13 We agree with the District Court that Pearson failed to present evidence to establish a genuine issue of material fact as to whether McPhillips and Raulston intended to enter into a joint venture. Given that intent is crucial to the determination of whether a joint venture exists, *Rae*, 112 Mont. at 168, 114 P.2d at 1064, McPhillips demonstrated entitlement to judgment as a matter of law on this issue.

¶14 *2. Whether the District Court erred in finding that using a cutting torch is not an inherently dangerous activity.*

¶15 As a general rule, a person who hires an independent contractor is not liable for the contractor's torts.[1] *Beckman v. Butte-Silver Bow Cnty.*, 2000 MT 112, ¶ 12, 299 Mont. 389, 1 P.3d 348. However, an exception to this rule occurs when the independent contractor is engaged in an inherently dangerous activity. *Beckman*, ¶ 12. In such cases, the employer is vicariously liable for injuries to others caused by the contractor's failure to take precautions to reduce the unreasonable risks associated with engaging in the inherently dangerous activity. *See Beckman*, ¶ 24.

¶16 Pearson contends that McPhillips is vicariously liable because Raulston engaged in an inherently dangerous activity when he used a torch to cut the scrap metal on a dry and windy day. In rejecting this argument, the District Court cited *Woodward v. Metille*,

---

[1] The parties dispute Raulston's status as an independent contractor; however, his status is irrelevant to our resolution of this issue because the undisputed facts do not support a conclusion that Raulston was engaged in an inherently dangerous activity.

81 Ill. App. 3d 168 (1980). In *Woodward*, as in this case, an independent contractor was using a cutting torch to remove scrap metal from another person's property when he started a fire that spread to the plaintiffs' property. The plaintiffs sought to impute the contractor's negligence to the property owner, alleging that using a cutting torch on scrap metal is inherently dangerous. The Illinois Court of Appeals rejected this argument, holding: "The use of a cutting torch is an activity which, if carried on properly and by competent and careful operators, is not in itself inherently dangerous." *Woodward*, 81 Ill. App. 3d at 176. In reaching this decision, the court noted that, when the danger and likelihood of injury do not inhere in the nature of the activity, "but rather in the manner of its particular use at the time and at the place of occurrence," the activity is not inherently dangerous. *Woodward*, 81 Ill. App. 3d at 176. We used similar reasoning in *Beckman*. We compared the inherently dangerous activity of people working in trenches, "where a cave-in can cause death or serious bodily injury," with "[m]uch of the activity that occurs on a construction site [which], although potentially dangerous, is quite safe when simple, easy to follow safety precautions are taken," and thus not inherently dangerous. *Beckman*, ¶¶ 24-25.

¶17    Pearson contends that it is not simply Raulston's use of a cutting torch itself, but his use of a cutting torch on a dry and windy day that made it inherently dangerous. Under Pearson's argument, the manner of Raulston's use of the torch at the time and place of occurrence is what made the activity inherently dangerous. This argument contradicts our reasoning in *Beckman* that an activity is not inherently dangerous if simple, easy-to-follow safety precautions may be taken. Pearson cites no evidence that

the use of a cutting torch in and of itself, separate from the manner of use and place of occurrence, is inherently dangerous. Therefore, Pearson has not alleged facts to contradict McPhillips' assertion and the District Court's finding that Raulston's use of a cutting torch was not inherently dangerous.

## CONCLUSION

¶18    We affirm the District Court's decision and order.


/S/ JAMES JEREMIAH SHEA


We Concur:

/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ BETH BAKER


Justice Patricia Cotter, dissenting.

¶19    I dissent from the Court's Opinion. I would conclude that a joint venture was established as a matter of law, and reverse under Issue One. I would therefore not reach Issue Two.

¶20    In his affidavit, Scott O'Brien affirmatively states that "[o]n behalf of Mrs. McPhillips, I gave permission to Mr. Raulston to remove scrap metal in exchange for a percentage of the value recovered." O'Brien drew a map for Raulston upon which he set forth those areas of the property from which scrap metal could be taken as well as the basic terms of the parties' agreement. A bargain was struck whereby Raulston benefited by gaining access to the property to remove scrap metal for profit, and McPhillips

benefited by having unwanted scrap metal removed from her property at no cost while receiving 35% of the proceeds from the sale of the scrap. It is difficult for me to comprehend under these facts how the Court can conclude as a matter of law that the parties did not intend to accomplish a joint venture.

¶21 As we stated in *Murphy*: "Broadly speaking, a joint adventure may be characterized as a quasi-partnership in a single adventure undertaken for mutual gain. The terms joint adventure and joint venture are synonymous." *Murphy*, 178 Mont. at 303, 583 P.2d at 1053 (citing 48 C.J.S. *Joint Adventurers* § 1, p. 803). *Rae*, too, characterizes a joint adventure as being a single business enterprise "for which purpose they [the joint adventurers] combine their property, money, effects, skill, and knowledge." *Rae*, 112 Mont. at 167, 114 P.2d at 1064. Further, the court observed that "[t]he contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise." *Rae*, 112 Mont. at 169, 114 P.2d at 1065. This is precisely what we have here: a single venture undertaken for mutual gain with each party contributing something promotive of the enterprise. I don't know how we can characterize the parties' one-time agreement entered for mutual gain as anything other than a joint venture under the foregoing cases.

¶22 The Court cites *Murphy* for the proposition that each joint venturer must have "'the right of control over the others and an equal right to a voice in performing the joint venture, as well as in controlling the agencies used in its performance.'" Opinion, ¶ 12 (quoting *Murphy*, 178 Mont. at 304, 583 P.2d at 1053). The Court neglects to add this

sentence that immediately follows the Court's quoted *Murphy* excerpt: "However, one or more members of the joint adventure may entrust certain performances of the enterprise to one or more of the other members." *Murphy*, 178 Mont. at 304, 583 P.2d at 1053 (citing 48 C.J.S. *Joint Adventures* § 5c, p. 828). The fact that McPhillips entrusted performance of the removal of the scrap to Raulston instead of dictating how the removal should be accomplished does not signify the lack of an equal voice in the performance of the enterprise; it simply establishes that—through O'Brien—she left the details to Raulston.

¶23    For the foregoing reasons, I would conclude that the undisputed material facts support the legal conclusion that the parties entered into a joint venture. I therefore dissent.

/S/ PATRICIA COTTER