Karl R. Johnson, Plaintiff-Appellee, v. Central Tile & Terrazzo Co., an Illinois Corporation, Linden & Sons, Inc., an Illinois Corporation, and Home Savings & Loan Association of Rockford, an Illinois Corporation, Defendants-Appellants.

Gen. No. 64-127.

Second District.

May 11, 1965.

Williams, McCarthy & Kinley (John C. McCarthy, of counsel), for Central Tile & Terrazzo Co., appellant, Sype and Kalivoda, for Linden & Sons, Inc., appellant, Reno, Zahm, Folgate & Skolrood (Robert K. Skolrood, of counsel), for Home Savings and Loan Association, appellant, all of Rockford.

Maynard & Maynard, of Rockford (James F. Maynard, of counsel), for appellee.

MR. JUSTICE DAVIS delivered the opinion of the Court.

The plaintiff, Karl R. Johnson, brought this suit for injuries sustained in a fall in the entranceway of the building of Home Savings & Loan Association of Rockford (herein called Home). Besides Home, the plaintiff also sued Linden & Sons, Inc. (herein called

Linden), the general contractor, and Central Tile & Terrazzo Co. (herein called Central), the subcontractor, who was working on the floor in the entranceway the day the plaintiff fell.

■ The jury returned a verdict in favor of the plaintiff and against all three defendants in the sum of $30,000, and the court entered judgment thereon. Each of the defendants contends that the court should have directed a verdict in its favor and that the verdict was contrary to the manifest weight of the evidence. In addition, Linden charges error in the giving and refusing of certain instructions, and Home asserts error in the admission of certain evidence, which error, however, was not pursued in its Brief and Argument, and consequently, will not be considered.

On July, 13, 1961, Home entered into a written contract with Linden, as general contractor, for the construction of a new building. Linden subcontracted to Central the furnishing and installing of the terrazzo, tile and slate called for by the plans and specifications.

The new building was opened for business by Home on September 17, 1962. The work was substantially completed by this time. On the day following—the day of the accident—Linden had some workmen on the premises completing inconsequential items. The terrazzo work had previously been completed, but the architect had called Central asking it to return to bring out the color in the floor at the east entrance of the building. In response, two of Central's workmen were sent to the building on September 18, 1962, to work on the floor in the east entranceway, the general area where the plaintiff fell.

Because of conflict in the testimony as to where the workmen had been working at the time of the occurrence, we describe this entranceway. It is on the east side of the building and provides access thereto for

customers from the building parking lot, which is directly to the east. There are two, glass outer doors and then a distance of about 18 feet to the glass doors providing access to the part of the building occupied by Home. About 9 feet inside the outer doors, and to the left, or south, is an entrance to an insurance office. To the right of the entrance doors, or to the north upon entry, is a railing, extending for about 9 feet along the stairway to the basement. The width of the entranceway between the railing and the wall, to the left, is about 9 feet. Beyond the railing, which guards the stairway to the basement, the entranceway extends to the north, or right, to give access to the stairway to the basement, the stairway to the second floor, and to the elevator. This part of the entranceway exceeds 10 feet in width from the north side to the railing just mentioned.

With the facts in mind, we turn to the various versions of what transpired on the day of the accident. Richard Boomgarden, an employee of Central, and Dan Selk, a helper, were sent by their employer to Home, with instructions to bring out the color of the floor on the east entranceway of the building. This was done by applying a mixture of linseed oil and turpentine to the floor, and then buffing the floor. Boomgarden testified that they applied no wax, soap or water, but rather swept the entire area before applying the mixture.

He testified that they arrived at the building at approximately a quarter to eight on the morning of September 18. After arrival and before commencing work, he asked a man inside Home building if Home would lock the doors because of the work. The man answered, "I'm sorry, it's a day of business. I can't." He stated that they first treated the area in front of the elevator, from the north wall south to about, or a little beyond, the line of the railing of the stairway.

267

They completed the work in this area before 9:00 o'clock. They then did the stairs and landing to the basement: next, the stairs and landing and balcony above the first floor. These areas were all completed in the forenoon.

Boomgarden testified that they did not work on the entranceway between the outer doors and inner doors leading to the Home portion of the building, until after lunch. Some question arose as to the paper he laid on the floor while working on the area in front of the Home entrance. He testified that when he first arrived in the morning, he placed a sheet of paper, about three feet wide, between the outer doors and the entrance to the insurance office, on the south side of the entranceway. This was done because a safe was to be moved into that office. He further testified that in the afternoon, when doing that part of the entranceway between the outer doors and the Home inner doors, he did half the width of the entranceway at a time. He was not positive whether he first worked on the south or north half. However, when he first worked on half the entranceway, he had a sheet of paper about three feet in width over the other half and between the inner and outer doors. He said that people would normally walk on the paper when it was on the floor; and that this would keep them from walking over the area where he was working and from tracking linseed oil onto Home's carpeting.

Boomgarden's helper, Daniel Selk, was 19 years old on the day in question and had worked for Central less than a year. He contradicted much of Boomgarden's testimony. He first said that after applying the linseed oil and turpentine by rubbing it into the floor with a rag, they used soap and water to clean the floor and then applied a wax and polished the floor with a large buffing machine. Later he

stated that he was not sure about the use of soap, water or wax. He didn't remember what part of the entranceway they did first, but testified that they had done work on that part between the outer and inner doors, prior to lunch.

Selk said that they put down only one sheet of paper, and that it ran in an easterly and westerly direction straight from the outside doors to the inside entrance of Home. He did not recall that anyone went into the insurance office or delivered anything there. At one point, he testified that he did not recall at what stage they laid the paper, but at another point, testified it was after they had done half the entranceway. He confirmed that Mr. Boomgarden had talked to someone, apparently connected with Home, who said they could not lock the doors. Both witnesses said there were no barricades or warnings of the work in progress, and neither saw the plaintiff.

The plaintiff testified that he went to the Home building at about 10:30 in the morning of September 18. He was a real estate salesman and was going to check on the progress being made on a mortgage application pertaining to real estate which he had sold. He entered the building through the east doors and walked across the terrazzo entranceway. He did not notice any men working, or any equipment, but did notice a strip of paper along the south wall of the entranceway, extending all the way to the inner doors leading to the Home portion of the building. He walked at a normal pace, not looking at the floor, but straight ahead. The weather was dry as was the parking lot outside. When he had proceeded to a point about a foot from the inner doors, his heel slipped, as if on grease, and he fell. As he was getting up, he briefly looked at the floor and saw no substance on the floor at that point, but did see a mark like a heel mark. He did not examine his clothes for

269

any foreign material after he got up, and did not return to the entranceway where he fell. He didn't see anything unusual about the floor. After the fall, he went into the Home office and sat down for a while. About 10 or 15 minutes later, he saw his brother there; they left the building by another exit and went to a nearby restaurant for a cup of coffee, after which, he returned to his office. By this time, plaintiff experienced severe pain and felt a numbness in his legs. An ambulance took him from his office to the hospital.

The plaintiff's brother was a director of Home and went to the new place of business on the day in question to see "how things were shaping up." He arrived sometime between 10:00 and 11:00 in the morning and entered through the same east entrance. He testified that as he entered the building, one or two men were working on the floor at a point about 15 feet inside the outer doors and along the south wall. There was some goo on the floor, and he stepped to his right, which would be along the railing, to get around it. The men were working in the area between the door to the insurance office and the inner doors to the Home office area. The buffer was standing in the center of the area where they were working. The area covered by the substance was 5′ by 5′, or probably more. The men were on their knees and to his left, as he walked in. He couldn't say that he saw any paper. He saw his brother shortly after he entered the building and did not return to the building again that day.

Central contends that the trial court should have directed a verdict in its favor and that the verdict, as to it, is contrary to the manifest weight of the evidence. This position is bottomed on the proposition that its workmen did no work, on that portion of the entranceway between the outer doors and the in-

ner doors to the Home lobby area, until after the 12:00 lunch hour. This is a close case factually, and this contention is not without some authenticity.

Boomgarden denied having worked on this part of the entranceway until after the lunch hour. If the jury believed his testimony, then the only possibility of imposing liability upon Central would rest upon the inference that Boomgarden and Selk, in doing the north part of the entranceway in front of the elevator and south to the line of the railing, had spilled the linseed oil mixture over part of the entranceway to the Home lobby area, leaving such mixture on the floor on which the plaintiff slipped. If this were the only basis for recovery, the verdict of the jury would be based upon too many assumptions and inferences and not supported by competent evidence. Carter v. Winter, 50 Ill App2d 467, 480, 200 NE2d 528 (4th Dist 1964).

However, we do not believe that the verdict of the jury is without basis. Boomgarden also testified that he did not place the paper leading into the Home lobby area until he was working on that part of the entranceway. It was his belief, that the paper seen there in the morning was the one placed there by him leading to the insurance office. But his helper, Selk, said only one sheet of paper was placed on the floor, and this extended to the Home portion of the premises. This would tend to confirm the testimony of the plaintiff that as he walked into the building he saw the paper along the south wall, extending to the Home lobby area. This would also confirm that he was walking along a portion of the floor which the workmen had just completed.

Boomgarden testified that as soon as the first half of this entranceway was completed, he placed the paper on that half and proceeded with the other half, and placed the paper over the latter half when that

271

was completed. Elsewhere he testified, however, that when he did the first half, he placed the paper over the other half, so that people would walk on that and not walk on the half where he was working. This was consistent with his concern about keeping the floor clean until he worked on it. Elsewhere, he again testified that he placed the paper on the south half of the entranceway, first. If this testimony is believed, then it is apparent that when the plaintiff walked along the north half of the entranceway, observing the paper to his left, he was walking where the workmen were then working, or had just completed working.

The evidence also offers an explanation of why the plaintiff did not see any workmen. Boomgarden testified that the only time he left the premises was when he went to a paint store, next door, to buy a little linseed oil. While he said that his helper, Selk, did not go with him, Selk testified that he, not Boomgarden, went to the paint store. We believe this would warrant the jury in finding that both had gone to the paint store, leaving no workmen present when the plaintiff entered the building.

While Boomgarden testified that the work was done and the paper placed adjacent to the Home lobby entrance in the afternoon, two tellers from the Home office confirmed the testimony of Selk and the plaintiff that the paper was along the south wall in the morning and extended all the way to the inner doors. However, Boomgarden also testified that he laid the paper on the south half of the entranceway first, and that while working on the first half, he put the paper on the other half and did not place a paper on the last half of the entranceway. If credence is given to this testimony, he worked on the north half of said entranceway first, removed the paper and then worked on the south part thereof. This would be consistent

272

with the testimony of plaintiff's brother that when he arrived, at a time shortly after the plaintiff was injured, the workmen were working along the south wall and he noticed no paper.

It is undisputed that the mixture of linseed oil and turpentine used on the floor was slippery. Boomgarden testified that he asked that the doors be locked because he knew that someone might slip. He further testified that a young fellow, apparently working for Home, stood on the stairway for a while cautioning the ladies, who were using the stairs, that the stairs were slippery.

■ In view of the evidence taken with its intendments most favorable to plaintiff, which tended to prove the material elements of plaintiff's case, we believe that the trial court properly denied Central's motion for directed verdict and for judgment notwithstanding the verdict. Lindroth v. Walgreen Co., 407 Ill 121, 130, 94 NE2d 847 (1950).

■ In addition, we are not unmindful that the trial judge had the opportunity to hear the testimony, observe the witnesses during the course of the trial and hear arguments of counsel. In deciding Central's motion for new trial, after the verdict was returned, the trial court had the duty to weigh the evidence to determine whether the plaintiff had proven his case by a preponderance of the evidence. Read v. Cummings, 324 Ill App 607, 609, 59 NE2d 325 (1st Dist 1945).

■ In passing on the question of the manifest weight of the evidence, we must not only consider all the evidence in the record and the verdict of the jury, but also the trial court's denial of a motion for a new trial. Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 11e, 180 NE2d 347 (1st Dist 1961); Mokrzycki v. Olson Rug Co., 28 Ill App2d 117, 124, 170 NE2d 635 (1st Dist 1960); Read v. Cummings,

273

supra, at 610. We may substitute our judgment for that of the jury's only where its verdict is palpably erroneous and wholly unwarranted from the manifest weight of the evidence. Carter v. Winter, 50 Ill App2d 467, 479, 200 NE2d 528 (4th Dist 1964).

■■■ It was reasonable for the jury to find that the plaintiff slipped while walking over a part of the terrazzo floor just treated by the workmen and that the defendant, Central, knew that the floor was slippery immediately after the linseed oil and turpentine mixture was put on it. Central provided no signs, barricades or warnings. There was nothing unreasonable or negligent in the manner in which plaintiff proceeded across the entranceway, looking ahead. Whether a person walking, as in this case, was in the exercise of due care, is pre-eminently a question for the jury. The plaintiff here had a right to assume that the floor was reasonably safe and that he would have been given warning of any hazardous condition. Geraghty v. Burr Oak Lanes, Inc., 5 Ill2d 153, 158, 125 NE2d 47 (1955); Lubin v. Goldblatt Bros., Inc., 37 Ill App2d 437, 444, 445, 186 NE2d 64 (1st Dist 1962). Therefore, as to Central, we believe that there was a satisfactory basis in the evidence for the jury's verdict and that it was not against the manifest weight of the evidence.

■ We next turn to the liability of the defendant, Home. What we have said heretofore as to the cause of plaintiff's slipping is, of course, applicable here. Home does not question the status of the plaintiff as a business invitee, or its duty to exercise ordinary care in maintaining its premises in a reasonably safe condition for invitees such as plaintiff. Geraghty v. Burr Oak Lanes, Inc., 5 Ill2d 153, 158, 125 NE2d 47 (1955).

■ Home refers us to a number of cases supporting the general proposition that the mere showing

that the floors of a business establishment are "slick," "slippery," "shiny" or "polished" does not, standing alone, establish that the defendant has been negligent in its maintenance. However, we believe that neither this proposition, nor the cases cited by Home, are controlling here. In Dixon v. Hart, 344 Ill App 432, 101 NE2d 282 (4th Dist 1951), the court held a store not liable to a customer where the floor had been waxed 3 or 4 weeks prior to the fall and the plaintiff felt the floor only at a point some 25 to 30 feet from where she fell and found it "slick" there. In Custer v. St. Clair Country Club, 349 Ill App 316, 110 NE2d 697 (4th Dist 1953), the court held that the defendant club could not be liable where plaintiff fell at a small sticky spot on the dance floor, where defendant had prepared the floor for dancing as it had done for many years, and there was no showing as to who caused the spot, or what it was, or that the defendant had any notice of it. In Hartman v. Goldblatt Bros. Inc., 19 Ill App2d 563, 154 NE2d 872 (1st Dist 1958), the Court held the defendant was not liable where the plaintiff walked out of defendant's store on a snowy day and slipped on the wet sidewalk outside.

The significance of the Dixon case, supra, is found in the statement of the court, on page 435, that "the mere treating of a floor with a substance that gives it a polished surface is not negligence per se," but that some positive act of negligence must be shown before recovery can be had, such as: "that the floor had been freshly polished and no warning given that one section of floor was waxed or oiled while the remainder was untreated . . . ."

Equally applicable is the statement of the court in Olinger v. Great Atlantic & Pacific Tea Co., 21 Ill2d 469, 474, 173 NE2d 443 (1961), that where a business invitee is injured by slipping on a foreign

substance on defendant's premises, and there is evidence tending to show that defendant or its servants knew or should have known of its presence, the issue of negligence is for the jury. There was ample evidence in the case at bar, that Home actually knew, not only of the treatment being applied to the floor, but also that the floor would be hazardous to its patrons at least during the period when the workmen were there treating the floor. The trial court properly submitted the case to the jury, as to Home, and did not err in refusing to direct a verdict or to grant a judgment notwithstanding the verdict in its favor. Likewise, the verdict of the jury, as to the defendant, Home, was not against the manifest weight of the evidence.

We are of the opinion, however, that the trial court should have directed a verdict, or entered a judgment notwithstanding the verdict, on Linden's behalf. Central, under its contract with Linden, agreed to furnish and install all of the terrazzo tile and slate for a fixed price. Linden neither had, nor exercised, control or supervision over the manner or method of achieving those results. Central's obligation was to do the job according to the plans and specifications of the architect and it took instructions from him. It was the architect who directed Central to return, after the job was completed, to bring out the color in a floor he thought too dull. It is clear that Central was an independent contractor and Linden its contractee. Gabel Mfg. Co. v. Murphy, 390 Ill 455, 461, 462, 62 NE2d 401 (1945); 17 ILP, page 368 et seq., Employment, secs 3, 4.

Plaintiff contends that, notwithstanding the general rule that a contractee is not liable for the negligence of its contractor, this case falls within an exception to the rule. The basis for the exception, though variously characterized, is that if one employs

another to do work which he should recognize as involving some peculiar risk to others unless special precautions are taken, the one doing the employing will remain liable if harm results because these precautions are not taken. The exception is sometimes said to apply where the work contracted is "inherently" or "intrinsically" dangerous or will be a probable source of injury to others unless certain precautions are taken. The duty to take these precautions is then absolute in the employer; he may not delegate this duty. American Tel. & Tel. Co. v. Leveque, 30 Ill App2d 120, 130, 173 NE2d 737 (2nd Dist 1961); Donohue v. George W. Stiles Const. Co., 214 Ill App 82, 91 (1st Dist 1919); 33 ALR2d 7, 47, 51.

 We cannot say that the hiring of Central to do the terrazzo work involved the risk of bodily harm sufficient to remove this case from the general rule that the contractee is not liable for the negligent acts of its independent contractor. This is especially true where, as here, the construction was completed and Central was called back after the owner had taken occupancy and control of the building. The peculiar risk exception is particularly applicable to cases such as Donohue, supra, where the construction work contracted involved structural steel repair work in a post office to be carried on over the heads of post office employees engaged in their normal work. But to extend the exception to the facts of the case at bar, is unwarranted. All activity involves some risk or exposure of risk to others, but it is only where the work is inherently dangerous or a probable source of injury to others, that a contractee may not delegate the duty to take precautions.

The plaintiff suggests that the case of Leatherman v. Schueler Bros., Inc., 40 Ill App2d 56, 189 NE2d 10 (4th Dist 1963) is controlling. There the general contractor was engaged in constructing a number of

houses. The plaintiff, a representative of the power company, entered the house in question to complete installation of the gas meter. In doing so, he slipped on a stairway that had just been freshly painted by the painting contractor, an independent contractor. The jury found the general contractor liable and the painting subcontractor not liable. The reviewing court found that the general contractor had retained control over the entire premises; and that it had a duty to afford adequate protection for persons lawfully upon the premises, against injury which might be anticipated as the probable consequences of the work of subcontractors. The court concluded that the contractor and subcontractor had separate duties to guard the plaintiff against injuries which might naturally follow the painter's acts, and, at page 61, stated: "This rule lies four-square within the broader rule set forth by our Supreme Court that 'the true basis of liability is the foreseeability of harm . . .' Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836 . . . ."

In the case at bar, the general contractor did not retain control over the premises, but turned it over to Home, which had taken possession and control and had opened the building for business on the previous day. The fact that several employees of Linden were finishing up minor items of work in parts of the building where patrons of Home would not be interfered with, does not alter Linden's surrender of control.

The building was no longer under construction: the terrazzo floor was completed. Home had occupied it for business. To the knowledge of Linden, Central was through with its work and had no reason to be on the premises. We find it difficult to conceive how Linden would have taken precaution against that which was not within its knowledge—actual or constructive. See Kuhn v. Goedde, 26 Ill App2d 123, 129, 167 NE2d 805 (4th Dist 1960). Liability on the basis of

278

foreseeability of harm, cannot be extended to Linden under these facts. Thus, it is unnecessary to consider the contentions of Linden with respect to errors in giving and refusing certain instructions.

The judgment insofar as it relates to the defendant, Linden, is thus reversed, and judgment is entered herein in favor of the defendant, Linden, and against plaintiff under Count II of the complaint. In all other respects, the judgment is affirmed.

Judgment reversed in part and affirmed in part.

ABRAHAMSON, P. J. and MORAN, J., concur.