KENNETH WOODWARD, d/b/a Woodward Welding, Johnson Pattern and Machine Works, Inc., *et al.*, Plaintiffs-Appellants, *v.* DANNY METTILLE *et al.*, Defendants.—(GENO MONTERASTELLI, Defendant-Appellee.)

Third District   No. 78-431

Opinion filed February  1, 1980.

Peter F. Ferracuti, of Ottawa, for appellants.

T. Donald Henson and Robert M. Hansen, both of Herbolsheimer, Lannon, Henson and Duncan, P. C., for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is an appeal by plaintiffs Kenneth Woodward, Johnson Pattern and Machine Works, and Ashland Oil Company (hereinafter "plaintiffs") from the judgments of the circuit court entered in favor of defendant Geno Monterastelli in plaintiffs' actions against defendant. Prior to trial, plaintiffs' actions against defendants Paul and Danny Mettille were severed by the trial court from the present action. The only defendant in the instant case is Geno Monterastelli.

The suits grew out of a fire which originated in an Ottawa, Illinois, building owned by the defendant Monterastelli, which fire then spread to the adjacent premises of the plaintiffs. The plaintiffs' complaints included counts setting forth their theories of recovery based upon (1) *res ipsa loquitur*, (2) failure to take precautions with regard to an inherently dangerous activity, and (3) negligent hiring of an independent contractor. At the close of plaintiffs' case, the trial court directed a verdict for defendant as to the counts based upon *res ipsa loquitur* and the conduct of an inherently dangerous activity. The case was finally submitted to the jury on the negligent hiring theory. The jury returned general verdicts for the defendant as to all three plaintiffs. The jury also made specific findings, by way of special interrogatories, that each of the plaintiffs was contributorily negligent. The plaintiffs appeal from the directed verdicts, the denial of their own directed verdict motion, and the general verdict and special findings of the jury. Numerous issues are raised, including questions as to the directed verdicts, the severance of the other defendants, the findings of contributory negligence, rulings on the evidence, prejudicial closing argument, a denial of plaintiffs' motion to amend their complaint, and eight jury instructions. A total of 10 issues, with 11 separate subissues, are raised by the appellant-plaintiffs. No purpose would be served by setting them out at this time, and we shall take them up individually after a recitation of pertinent factual background.

The record discloses that the defendant Geno Monterastelli owned a large warehouse building in Ottawa, Illinois, which was part of a larger building complex known as the King-Hamilton Complex. The buildings occupied approximately 500 square feet. Adjacent to the complex on one side was a tavern owned and operated by Monterastelli. On the other side of the complex and adjacent thereto were two structures owned by plaintiff Johnson Pattern and Machine Works (hereinafter Johnson Pattern). The front half of one of these buildings, a woodframe structure, was rented to plaintiff Kenneth Woodward, d/b/a Woodward Welding. Johnson Pattern used the back half of that building for storage. The next building, a cement block building, housed the offices and pattern and machine shops of Johnson Pattern. Monterastelli owned the King-Hamilton Complex (including therein the King-Hamilton Building, which had been originally built in 1840). Plaintiff Ashland Oil Company, a wholesale distributor of tires, leased two locations in the complex for storage of its tires.

The evidence indicates that in December 1974, and for some time prior thereto, the King-Hamilton Building, within the complex, had been in a state of decay and disrepair. The windows were broken out and the walls and roof needed repair. The building was empty on the inside, with the exception of a three-story brick building located and constructed inside of the four-story King-Hamilton Building. The interior building was rented to E & J Foundry. The evidence indicated that in December 1974, at the time of the fire, all that was visible inside the King-Hamilton Building were 12 by 12 wooden beams and a wooden plank floor. The interior support timbers had paint and fuel oil soaked into them from previous tenants' manufacturing businesses. The floor at some places was decayed, and a portion had been dropped by Monterastelli to prevent a fire. The boiler in the building was not operable and was located in the middle of the building in a room all by itself. The utilities had been taken out of the building. The water had been disconnected, and all power to the building had been severed. There was no gas or propane in the building and nothing of a combustible nature on the first floor except the wooden plank flooring.

Approximately two to three months prior to December 4, 1974, Geno Monterastelli had given Paul and Danny Mettille permission to cut and remove the boiler from the King-Hamilton Building. The Mettilles sold the scrap metal they removed, and there was nothing to indicate that Monterastelli received any part of the moneys received for the scrap metal. Paul Mettille was an experienced welder. Shortly after having been given permission to remove the boiler, Paul and Danny Mettille went to plaintiff Kenneth Woodward for the purpose of getting him to open a gate between his shop, adjacent to the building, and the King-Hamilton

Building. They needed to enter the building through that access in order to get their equipment into the building. The cutting equipment was in the back of Danny Mettille's pickup truck. Woodward at first refused to let them into the building through his gate. Later, Geno Monterastelli returned with the Mettilles, and Woodward ultimately allowed the Mettilles into the King-Hamilton Building. The Mettilles backed the pickup into the building. The truck contained their cutting torches and two sets of oxygen and acetylene tanks. During the following months, Woodward regularly saw the men enter the premises to do work and also take scrap metal therefrom for the purpose of sale.

The evidence demonstrated that while Monterastelli had only given the Mettilles express permission to remove the boiler, he was aware that in their work they were also removing pipes and other iron from the building. Monterastelli was also aware that they were using cutting torches in their work, and he was aware of the condition of his building and the fact of the adjacent business neighbors. There was conflicting testimony concerning the presence of fire extinguishers in the building, but Monterastelli, while claiming that such were present, admitted that he had not checked them and did not know if they were operable. Monterastelli stated that he took no precautions or participation with respect to the cutting operations within the building and that he only visited the building once during the several months the Mettilles worked therein.

Approximately four to six weeks prior to December 4, 1974, Kenneth Woodward went into the boiler room of the King-Hamilton Building from his adjacent business premises. There is no indication in the record that he sought, or needed to seek, anyone's permission to enter the King-Hamilton Building. Woodward had been the go-between supplier of oxygen and acetylene for the Mettilles during their scrapping work in the building. The Mettilles would purchase the tanks from another dealer but Woodward would store the full and the used tanks at his business. It was from Woodward that the Mettilles would pick up full tanks and to him that they would deliver the spent tanks. When Woodward went into the building on the occasion some four to six weeks before the fire, he found the Mettilles cutting on the boiler. Woodward testified that he saw no fire extinguishers in the room, that the tanks of fuel were standing upright and not secured, and that the hoses from the tanks were on the ground alongside the boiler. When asked at trial for his opinion as to the carefulness of the work habits he observed during that visit, Woodward stated his opinion that the Mettilles were operating the cutting torches in a hazardous manner. He based that conclusion on the fact that the interior of the building was combustible and on the failure to have fire extinguishers and someone to man them nearby the work. He also stated

that the tanks ought to have been secured and the hoses off the ground. Woodward also testified that he had known Paul Mettille for about four years and that Mettille had a reputation for carelessness in the community. He testified that he had, on other occasions, seen Mettille inside the building under the influence of alcohol. There is no indication that he ever apprised Monterastelli of any of his observations or knowledge concerning Mettille and the cutting work he was doing.

Stan Dale, general manager for plaintiff Johnson Pattern, also knew Paul and Danny Mettille. Several months prior to the December 4 fire, he noted them working in the King-Hamilton Building, removing pipe and iron. Dale was also aware of the general rundown condition of the building. Don Bowersox, assistant manager for Ashland Oil, had never been in the building, but he was aware of its condition. Several weeks before the fire, an employee had informed him that people were using a cutting torch in the building to remove scrap metal. He reported this fact to his general manager, but no further inquiries or inspection was made by anyone from Ashland Oil Company.

On the day of the fire, December 4, 1974, Paul Mettille had gone to the King-Hamilton Building around 10:30 or 11 in the morning. He was alone that day. He was cutting pipe at a place located away from the boiler but still on the first floor. He had lunch at Monterastelli's tavern, as he would several times a week, and on this day he had a couple of beers during lunch. He testified that those beers were the only alcohol he consumed that day prior to the fire. He returned to work about 1 p.m. and started again cutting on the water pipes. At about 3 or 3:30 he was cutting a vertical water pipe located about six inches from the floor when a piece of hot slag fell into a crack between two pieces of wooden flooring by a beam. "Slag" is a term used by welders to refer to the red hot molten metal which oftentimes results from cutting metal. Mettille stated that he could not get at the slag, a ball about the size of a charcoal briquet, located in a crack between floor boards. The wood began smoldering.

Mettille immediately went to the Woodward Welding shop next door and there he told Kenneth Woodward that he had a little fire in the building and needed some water to put it out. Present during that conversation was Don Link, an employee of Johnson Pattern who then reported the conversation to Stan Dale, Johnson's general manager. Woodward later testified that Mettille's eyes were unusual and that he smelled liquor on his breath. Woodward also was to testify later that he was of the opinion that Mettille was under the influence of alcohol, although not "stoned or out of it." As noted, Mettille himself testified that he had only two beers and never drank heavily while doing heavy work such as that involved in the scrapping operations. Don Link, present during the conversation, stated that he noted nothing unusual about

Mettille's condition on the day of the fire. At any rate, Mettille got two five-gallon buckets of water from Woodward and returned to his work area and the slag fire. It had taken between 10 and 15 minutes to get the water, and when he returned the spot was bigger and red. He poured the water down the crack and it sizzled. He noticed no glowing and no smoke. He then went back to Woodward's to get two more buckets of water and a pry bar. With the bar he opened the crack so that the water was better able to get at the hot spot, and he again poured the water on the area. He may also have poured another bucket or two on the spot. No one from Woodward Welding or Johnson Pattern accompanied Mettille back to the area of the fire or made any independent inquiry or examination. Mettille stayed in the building near the area of the fire until about 4:45 p.m. to make certain that the fire was out. He did not see or smell any smoke nor any other evidence that the fire continued to burn. He left around 5 p.m. and passed through Woodward Welding on his way out. Kenneth Woodward testified that he noticed a half-pint of whiskey in Mettille's back pocket as he left. Mettille testified at trial that he may have had such a bottle, but he stated that he did not drink from it during his work on that day. Neither Woodward nor anyone from Johnson Pattern made any further inquiry concerning the fire, nor did they inspect the premises or inform Monterastelli or the fire department of its occurrence.

At about 9:52 p.m. on December 4, the Ottawa fire department responded to a fire call at the King-Hamilton Building. When the department arrived at the scene, the middle of that structure was a roaring inferno. The buildings owned by plaintiffs had not yet been affected at the time the department arrived. Later, the fire spread to Woodward Welding, Johnson Pattern, and the metal warehouse of Ashland Oil. The fire destroyed the wood frame building occupied by Woodward Welding and Johnson Pattern, as well as part of the cement building owned and occupied by Johnson Pattern. All of Ashland Oil's stored tires were destroyed. Kenneth Woodward sought damages of $12,330. Johnson Pattern claimed damages of $86,626 and Ashland Oil made claims totaling $142,275. The plaintiffs brought suits seeking these recoveries.

Each of the plaintiffs filed a separate suit against Geno Monterastelli with the Mettilles later added as additional defendants. The Mettilles neither answered nor entered an appearance. At the time of trial they had not responded and had not obtained counsel. No default had been taken by plaintiffs. On the first day of trial, Monterastelli moved for a severance from the Mettilles. The trial court, over plaintiffs' objections, granted the motion and the trial proceeded. Recovery theories were advanced based upon the conduct of an inherently dangerous activity, *res ipsa loquitur*, and negligent hiring.

In addition to the evidence already set forth, other pertinent evidence was produced at trial. Paul Mettille, testifying as a witness for plaintiffs, admitted that he was an alcoholic and that he had a problem with alcoholism during the two-month period prior to the fire. During this time he was consuming as much as a quart of whiskey a day at times. As previously noted, Mettille, however, denied that he drank while doing heavy work, such as that on the day of the fire; and he specifically denied that he had anything more than two bottles of beer, during lunch, on the day of the fire. Mettille also indicated that while he stopped in at Monterastelli's tavern a couple or three times a week for lunch, he did his heavy drinking elsewhere. Monterastelli, for his part, denied knowing that Mettille was an alcoholic, stating that he had never seen him when he appeared to be drunk. Other testimony, from local construction union personnel, was to the effect that Paul Mettille was a careful and experienced welder and worker and that he had such a reputation in the community. Monterastelli testified that he knew Mettille to be a hard worker and that he had never heard that he was careless. As noted earlier, Kenneth Woodward testified that Mettille had a reputation for care-lessness.

At the close of plaintiffs' cases, the trial court directed a verdict against the plaintiffs and dismissed the counts in their complaints based upon *res ipsa loquitur* and inherently dangerous activity theories. The case was submitted to the jury on a negligent hiring or negligent permission theory. The jury returned general verdicts for the defendants and against all three plaintiffs. The basis of plaintiffs' claims was that Monterastelli knew or should have known that Mettille was an alcoholic and would be careless, and therefore he was negligent in permitting Mettille to do the work, since, as a result of Mettille's alcoholism, he, Mettille, was negligent in starting or failing to extinguish the fire which caused the plaintiffs' damages. In addition to the general verdicts for defendant on this theory, the jury also answered three special inter-rogatories. In the answers to the interrogatories, the jury found each of the plaintiffs to have been contributorily negligent with respect to the damages they sustained. From these judgments, rendered on the basis of the jury's verdict, the plaintiffs appeal.

■■ The first issue raised addressed the correctness of the trial court's action in directing a verdict against plaintiffs on the inherently danger-ous activity theory. Plaintiffs had sought to impute Mettille's alleged negligence to the owner Monterastelli under this theory, an accepted exception to the general rule that a property owner is not liable for injuries caused by the negligence of an independent contractor. (*Johnson v. Central Tile & Terrazzo Co.* (1965), 59 Ill. App. 2d 262, 207 N.E.2d 160.) Where an independent contractor is engaged in an inherently

dangerous activity, the master-servant relationship is imposed as a matter of law. The question presented is whether Paul Mettille was engaged in an inherently dangerous activity when using the cutting torch inside the King-Hamilton Building. The rationale underlying this exception to the general rule is that an owner ought to be required to take special precautions, and be liable for not doing so, where an independent contractor, on the owner's property, is engaged in an activity or using an instrumentality which, even when properly and carefully operated, poses a significant risk of injury or damage to others. As this court stated in *Watts v. Bacon & Van Buskirk Glass Co.* (1958), 20 Ill. App. 2d 164, 168, 155 N.E.2d 333:

> "The term 'inherently dangerous' means that type of danger which inheres in the instrumentality or condition itself at all times, thereby requiring special precautions to be taken with regard to it to prevent injury and does not mean danger which arises from mere casual or collateral negligence of others with respect to it under particular circumstances. Concisely stated, the term means, dangerous in its normal or nondefective state as for example, explosives and poisons."

It was also noted in *Snow v. Judy* (1968), 96 Ill. App. 2d 420, 422-23, 239 N.E.2d 327, that:

> "Where the experience of mankind teaches that the instrumentality, the conduct or the physical condition is per se inherently dangerous, society imposes a duty to act or to refrain from acting in a manner reasonably calculated to avoid injury to others from the known or readily apparent danger."

The court in *Snow v. Judy* was faced with the use of barbed wire as an allegedly dangerous instrumentality. It noted that the danger and likelihood of injury did not inhere in the nature of the barbed wire, but rather in the manner of its particular use at the time and at the place of occurrence. (96 Ill. App. 2d 420, 423.) Such matters, going to collateral negligence, are not subsumed under the inherently dangerous theory. In the present case, a similar conclusion is called for and was recognized by the trial court. The use of a cutting torch is an activity which, if carried on properly and by competent and careful operators, is not in itself inherently dangerous. It does not pose the risk and danger to others or others' property when properly conducted as does the use of explosives, corrosives or other similarly inherently dangerous activities and products. That this is so is underlined by plaintiffs' entire argument that the risk to their properties arose not simply because of the use of the cutting torch, but rather, and more to the point, because of the careless manner in which it was operated and because of the nature of the premises within which it was operated. By plaintiffs' own theory, the danger and risk arose not out

of the activity of cutting with the torch, but out of the collateral negligence of Paul Mettille with respect to that activity. Under the circumstances, the circuit court did not err in concluding that, as a matter of law, the plaintiffs were not entitled to recover on their inherently-dangerous-activity theory.

The plaintiffs, in seeking a reversal of the directed verdict on this theory, suggest a broader, more flexible approach to what constitutes an inherently dangerous activity or instrumentality. They assert a rule of law that looks to the entire context of a situation in determining whether a landowner has a duty to take special precautions. In support of their position they rely upon cases from other jurisdictions and on the Illinois Appellate Court case of *Donovan v. Raschke* (1969), 106 Ill. App. 2d 366, 246 N.E.2d 110. In *Donovan*, the court utilized a contextual, foreseeability approach advanced by plaintiffs. However, in *Donovan* the court was concerned with the nondelegable duty of a landowner abutting a public way to take precautions to protect passersby. The court applied a broader approach to a landowner's liability in that case (106 Ill. App. 2d 366, 370), refusing to address itself to a precise definition of "inherently dangerous." We note that this court has not hesitated to give precise meaning to those words (*Watts v. Bacon & Van Buskirk Glass Co.* (1958), 20 Ill. App. 2d 164, 168), and the definition given is consistent with the plain meaning of the words and the underlying rationale of the doctrine. In addition, the case relied upon by the court in *Donovan* for its flexible approach, *Johnson v. Central Tile & Terrazzo Co.* (1965), 59 Ill. App. 2d 262, 207 N.E.2d 160, held that no inherently-dangerous-activity or instrumentality was involved. (59 Ill. App. 2d 262, 277.) In the instant case, the circuit court's action in directing a verdict for defendant on plaintiffs' inherently-dangerous-activity theories is affirmed.

■■ The next issue raised is whether the court erred in directing verdicts for the defendant on plaintiffs' *res ipsa loquitur* counts. We affirm the trial court's actions thereon as well. *Res ipsa loquitur* is a doctrine of limited application, and whether it should be submitted to the jury is a question of law for the trial court. (*Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 449, 207 N.E.2d 305.) It is employed where certain conditions obtain which support the fairness of its use. One of the oft-stated conditions is that the positions of the parties with respect to proof of causation must be unequal. As noted in *Walsh v. Chicago Transit Authority* (1960), 28 Ill. App. 2d 243, 247, 171 N.E.2d 235:

> "The doctrine is applied as a matter of necessity and is based upon the theory that the defendant has, within its knowledge and control, evidence which the plaintiff does not possess and cannot conveniently obtain." (See *Metz*, 32 Ill. 2d 446, 451.)

In the instant case we find no significant disadvantage to the plaintiffs,

vis-a-vis the defendant Monterastelli, with respect to knowledge of the causative factors behind the fire. Monterastelli, according to the record, was inside the building only once during the time the Mettilles were working and at that time no cutting was being done by them. On the day of the fire, he was not in the building at all. Unlike the plaintiffs Johnson and Woodward, he had no knowledge of the afternoon incident on the day of the fire. Plaintiffs had as much knowledge of the facts leading to the fire, and as great an ability to discover such facts, as did defendant Monterastelli. The basic reason underlying the use of *res ipsa* is thus absent in this case. The court's decision to direct a verdict for Monterastelli on plaintiffs' *res ipsa* counts is affirmed.

■■ The third issue raised by plaintiffs concerns the jury's findings, by way of special interrogatory, that each plaintiff was contributorily negligent. Plaintiffs contend (1) that, as a matter of law, they were not guilty of contributory negligence and (2) that the answers to the special interrogatories finding them so were contrary to the manifest weight of the evidence. Before discussing this issue, however, we are met with defendant's unconvincing suggestion that the plaintiffs have waived this issue by failing to offer an instruction without mention of their due care. We find that plaintiffs sufficiently preserved the issue through two motions *in limine*, one during trial and one before, both of which sought to preclude evidence or argument on the question of plaintiffs' due care. These motions were denied, and it would not be in the interests of fairness to conclude that plaintiffs, faced with the court's decision that their due care was in issue, were required to continue to object or to submit instructions in order to preserve the issue for appeal. The issue has not been waived. Returning to their argument on appeal, plaintiffs strenuously argue that a property owner has no duty to anticipate the suspected negligent use of a neighbor's property and no duty to take affirmative action to try to stop such negligence. We find that the argument as thus framed does little to reflect the circumstances of the instant case or the law of Illinois on contributory negligence. The question in the case is not whether the plaintiffs ought to have anticipated the alleged negligence of Paul Mettille in working in defendant's building. The question is whether, given their knowledge and awareness of the circumstances on the day of the fire and the dangers presented thereby, the plaintiffs ought to have taken steps to protect their own property. To put it another way, the issue is whether there was a foreseeable risk which gave rise to a duty on their part to take some action to protect their property. The jury felt that each plaintiff had such a duty and that the duties had been breached by their failures to take any action on the day of the fire to protect their own property. It has been established that the degree of care required is commensurate with the known danger to which

a person or his property is exposed. (*Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Augustus Sparks* (1905), 122 Ill. App. 400, 403.) As regards the duty of property owners to protect their property, the court in *Harris v. City of Granite City* (1977), 52 Ill. App. 3d 782, 786, 365 N.E.2d 1034, stated:

> "In Illinois, one of the requisites of a negligence action is for the plaintiff to allege and prove his freedom from contributory negligence. [Citation.] Where there is no evidence on the issue, no instruction on contributory negligence should be given. [Citation.] However, where there is evidence presented as to the plaintiff's exercise of due care for the safety of his property, or his lack thereof, it is proper to issue instructions of contributory negligence."

The plaintiffs' reliance upon the United States Supreme Court opinion in *LeRoy Fibre Co. v. Chicago, Milwaukee, & St. Paul Ry. Co.* (1914), 232 U.S. 340, 58 L. Ed. 631, 34 S. Ct. 415, is unfounded. That case dealt specifically with an issue as to the limits upon a landowner's *use* of his own property because of its proximity to railroad property. The issue specifically raised pertained to railroads and adjacent property owners. We cannot adopt the argument that *LeRoy Fibre* establishes that property owners have no duty to respond to protect their property (1) when they are aware of an immediate known danger posed to that property by a condition or activity on an adjacent landowner's property and (2) when that danger can be easily lessened or removed by their own conduct. Unlike in the *LeRoy Fibre* case, in the case at bar it was not the use of plaintiffs' properties which would have had to have been changed in response to the danger. Here it was a failure to protect their property in the face of a known danger. The duty called for was not that of using their property differently, the duty asserted in *LeRoy Fibre*. The duty was that of taking steps within their power to see that the known danger, in this case the afternoon fire, had been brought completely under control on their neighbor's property. In the instant case, at least as to two of the plaintiffs, the evidence presented indicates that they were very much aware and concerned about the afternoon fire started by Paul Mettille, and yet they did nothing to make certain the fire had been completely extinguished.

The record reveals that on the afternoon of the day of the fire, Don Link, an employee of Johnson Pattern, was present at Woodward Welding when Paul Mettille entered to inform Kenneth Woodward that he needed water to extinguish a fire that was burning after a piece of slag dropped between floorboards. Link promptly reported the incident to his boss, Johnson's general manager, Stan Dale. Dale knew the Mettilles and knew that they had been removing iron and pipe from the King-Hamilton

Building. He was also aware of the condition of that building, having been in it on numerous occasions. He had previously complained to Monterastelli about the building's condition. Given knowledge of the condition of the building, given knowledge that the Mettilles were removing iron from the building, and given the knowledge, from Don Link, who felt it important enough to relay almost immediately to Stan Dale, that a fire had been started in the building by Mettille, we find that the jury was within its province in concluding that the plaintiff, Johnson Pattern, through its agents, was contributorily negligent in failing to take some action to protect their property. The jury may well have concluded that, at a minimum, someone from Johnson Pattern should have inquired further, either of Mettille or Monterastelli, as to the nature, extent, location and control of the afternoon fire. There was no showing that Stan Dale did not have access to the building. He might have walked over to check on the fire, or else he could have given Monterastelli a call.

■■ A similar conclusion also obtains when the evidence as to Woodward Welding's knowledge and awareness of the danger is surveyed. Kenneth Woodward testified that he knew of the combustible condition of the King-Hamilton Building and that he had observed the Mettilles using hazardous techniques when doing their cutting there. He also knew, according to his testimony, that Paul Mettille was a careless worker. On the day in question, he knew of the fire in the afternoon when Mettille informed him that it had started and was smoldering between the beams. Woodward, who was in the welding business, testified as an expert on cutting techniques and safety, and he cannot have been ignorant of the difficulties and dangers with such a situation in the old, wooden building. In addition, Woodward testified that he thought Mettille was under the influence of alcohol on the day of the fire. He also testified to seeing a half-pint or a pint in Mettille's back pocket as he left on the day of the fire. Under these circumstances, the jury was justified in concluding that Woodward had a duty to take some further steps to protect his own property and business. Again, at a minimum, he could have inquired further of Mettille or gone with him to make sure the fire was extinguished. There was no showing that he would have been denied access or in any way impeded in taking such action. From the record, it appears he had easy access to the buildings. He could have called Monterastelli and informed him of the situation and requested that further inquiry be made. In any event, given his knowledge and beliefs with regard to the situation, the jury was justified in finding that a reasonable man would have taken some action to satisfy himself that the situation was safely under control, and that by failing to take any action, Kenneth Woodward was contributorily negligent. As to both Johnson

Pattern and Woodward Welding, we find that the jury's answers to special interrogatories were not contrary to the manifest weight of the evidence. ■■ As to Ashland Oil Company, however, a different result is called for by the evidence. The record indicates that Ashland, through one of its employees, was aware that some people were in the King-Hamilton Building using a cutting torch to remove iron. The assistant manager of Ashland had learned this several weeks before the fire and had passed it on to his general manager. Ashland did not know who was doing the work, nor did it know of the afternoon fire on the fourth of December. This latter lack of knowledge is most significant on this appeal. No one from Ashland Oil was present at Woodward Welding when Mettille arrived that afternoon to ask for water to help put out the slag fire. Thus, Ashland had no reason to inquire or take other precautions on the day in question to protect their property. They were not faced with the same facts showing a specific, known immediate danger near their premises as were Woodward and Johnson Pattern. The evidence with regard to Ashland is not sufficient for the jury to have concluded that they were contributorily negligent and the issue, as to them, should not have been submitted to the jury. The answer of the jury on the special interrogatory as to Ashland Oil is contrary to the manifest weight of the evidence. The verdict as to Ashland Oil is reversed and the cause is remanded for a new trial as to that plaintiff.

Counsel for the defendant, in his brief and oral argument, argues that even if the special interrogatory was in error, the jury's entry of a general verdict in defendant's favor ought to stand, citing as dispositive *Prange v. Wallenburg* (1975), 27 Ill. App. 3d 618, 327 N.E.2d 450. That case is not controlling since there, neither the general verdict nor the special interrogatory was found to be contrary to the manifest weight of the evidence. (27 Ill. App. 3d 618, 626.) Neither does Rule 65 (Ill. Rev. Stat. 1977, ch. 110, par. 65) dictate a result, for that rule simply provides that when the special interrogatory is inconsistent with the general verdict, the special finding controls the verdict. In the instant case, we have concluded that the special interrogatory as to Ashland Oil, which was consistent with the general verdict, was against the manifest weight of the evidence. It is possible, when the facts and issues are surveyed, that the jury could have concluded all the issues, save contributory negligence, in favor of the plaintiff, but it could have then entered a general verdict for the defendant based on the finding of contributory negligence. Additionally, as counsel for plaintiffs point out, at least the issue of Mettille's negligence could have been decided for the plaintiffs. We conclude, under the circumstances, that the proper procedure is to remand the case, as to plaintiff Ashland Oil, for a new trial. *Starbuck v. Chicago, Rock Island &*

*Pacific R.R. Co.* (1977), 47 Ill. App. 3d 460, 464-65, 362 N.E.2d 401, citing *Freeman v. Chicago Transit Authority* (1965), 33 Ill. 2d 103, 210 N.E.2d 191, and *Borries v. Z. Frank, Inc.* (1967), 37 Ill. 2d 263, 226 N.E.2d 16.

■■ Having dealt with the central issues on appeal, we turn now to the less substantial issues raised by plaintiffs. Plaintiffs allege as error the court's decision to sever defendants Paul and Danny Mettille from the action against Monterastelli. (Ill. Rev. Stat. 1977, ch. 110, par. 52.) Such decisions are within the sound discretion of the trial court and in the instant case we find no abuse of discretion. At the time of trial, the Mettilles had not engaged counsel and had not made an appearance. Under these circumstances, faced with the prospect of their proceeding *pro se* in this complex case, the trial judge did not abuse his discretion when he granted the severance. We do not find the alleged prejudice to plaintiffs, their inability to call Paul Mettille as an adverse witness under section 60, is sufficient to warrant reversal. Paul Mettille did testify for plaintiffs. He testified that he was an alcoholic who drank a quart of whiskey a day during the months preceding the fire. He also testified that he may have had a half-pint in his hip pocket on the day of the fire. In addition to the testimony for the plaintiffs, the circuit court was willing to allow plaintiffs to cross-examine Mettille in the event he showed actual hostility. There was no error in the severance and no prejudice sufficient to warrant reversal.

■■ A related issue, whether the court erred in not calling Paul Mettille as a court's witness, is also raised. The trial court's power to call a witness as its own is a power which is used sparingly. (*Crespo v. John Hancock Mutual Life Insurance Co.* (1976), 41 Ill. App. 3d 506, 518, 354 N.E.2d 381.) It is to be used where a witness has testimony relevant to the issues and a miscarriage of justice might occur if the testimony is not brought to the attention of the fact-finder. In the present case, the testimony of Paul Mettille was presented to the jury. Plaintiffs called him as their witness and there is no showing that Mettille was hostile to them nor that they were prejudicially harmed by the court's failure to call Paul Mettille as its witness. There was no error in the court's refusal to call him as its witness. As noted in the *Crespo* case, "It is difficult to envision situations where the practice should be used, particularly in jury trials." We would note again, as to the substance of his testimony, that he admitted being an alcoholic and admitted drinking a quart of whiskey a day during the time in question. The plaintiffs' further contention that their inability to present impeaching evidence, that he had previously stated "two quarts a day," was prejudicial to them and requires a reversal is totally unconvincing. Having admitted a quart a day, we fail to see that the evidence as to quantity would have had an appreciable affect upon the jury. No reversible error

was committed by the court's refusing to call Paul Mettille as a court's witness.

■■ ■ The next issue raised by plaintiffs is whether the court erred in not allowing evidence of Paul Mettille's general reputation in the community for sobriety to be placed before the jury. As plaintiffs note, in a negligent-hiring case, the character of the employee for competency and skill is at issue and may be proven by incidents and reputation. (*Feigl v. Terminal R.R. Association* (1975), 30 Ill. App. 3d 55, 332 N.E.2d 416.) The trial court in ruling against the evidence of general reputation for sobriety indicated that any evidence of reputation for sobriety would have to relate to Mettille's work habits and his competency and skill at his employment. No proof was advanced that he had a reputation for being drunk or drinking while working. However, as the trial court set forth in its issues instructions to the jury, there was an issue in this case of whether Geno Monterastelli "was negligent in hiring, authorizing, or permitting Paul Mettille to remove scrap metal when he knew or in the exercise of ordinary care should have known that Paul Mettille was an alcoholic * * *." We find that the evidence of general reputation for sobriety was material and relevant to this issue. (*Cf. Western Stone Co. v. Whalen* (1894), 151 Ill. 472, 485, 38 N.E. 241; *Taylor v. Chicago & Alton R.R. Co.* (1911), 164 Ill. App. 348, 356.) The trial court erred in not allowing such evidence to be presented to the jury. However, this conclusion does not require a reversal of the judgments. Given the jury's findings that plaintiffs Woodward Welding and Johnson Pattern were contributorily negligent, it is apparent that even if the jury had before it the excluded evidence and had concluded negligence on the part of Monterastelli, the contributory negligence of plaintiffs Woodward and Johnson would have prevented their recoveries. In light of this, the decision of the court on this evidentiary question does not require reversal. In the retrial as to plaintiff Ashland Oil, such evidence should be admitted, if properly proffered, because it is relevant to the question of whether Monterastelli in the exercise of ordinary care ought to have known of Mettille's reputation for sobriety, or the lack thereof.

Other evidentiary questions raised can be briefly treated. The isolated, unemphasized question as to Woodward's knowledge of previous fires was not prejudicial, nor was the question as to a fire set by vagrants, which question was objected to and sustained by the trial court. These matters were relatively harmless and do not provide a sufficient basis upon which to reverse. Likewise we find no sufficient prejudice in questions relating to the number of employees of Ashland Oil or to possible tax benefits from the loss of the tires. As to the allegedly improper remark in closing argument, no objection was raised to such argument.

As such, it cannot be raised as an issue on appeal. *Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 294 N.E.2d 689.

The plaintiffs, continuing their litany of issues, also allege error in the court's refusal to allow their amendments to the complaints at the close of the evidence in order to conform the complaints to proof. Again, given the findings of contributory negligence as to Woodward Welding and Johnson Pattern, the issue loses its significance. As to Ashland Oil, it can seek to amend following remandment. We also find that the trial court did not abuse its discretion in refusing to allow the amendments. The court was within its discretion in refusing to allow them, after trial, to amend so as to advance their theories of failure to supervise and failure to take precautions where such theories had not been advanced previously.

■■ With regard to the instructions to the jury, plaintiffs raise issues concerning eight instructions. Plaintiffs' instructions 1, 1A and 7 were their issues instructions, and they were refused. The court's instructions 1 and 2 were the issues instructions as framed by it and as given to the jury. Plaintiffs' instructions 1 and 2 were properly refused because neither accurately stated the law. Those instructions failed to adequately inform the jury that recovery was premised upon a finding that Paul Mettille was in fact negligent and that his negligence was a result of his alcoholism. They also failed to note that defendant Monterastelli *in the exercise of ordinary care* should have known of Mettille's alcoholism, an important element of plaintiffs' cases. As such, they both failed to state all the elements that plaintiffs would need to prove in order to recover. Additionally, both instructions improperly emphasized evidence related to Mettille's alleged negligence. Instruction 1 also contained two theories of recovery, those asserted in the denied motion to amend, which were not advanced during the trial. Plaintiffs' rejected instruction 7, a standard negligence instruction, was properly denied since their theory of the case required an additional element, Mettille's negligence resulting from his alcoholism, to be proven. That element was omitted from the tendered standard instruction. As to the issues instructions that were given, the court's instructions 1 and 2, which were largely patterned from plaintiffs' rejected instructions, they accurately stated the issues and burden of proof in the case without unduly emphasizing evidence. For recovery, it would have been necessary for plaintiffs to prove (1) that Monterastelli knew, or in the exercise of ordinary care, should have known, that Mettille was an alcoholic, and thus it was foreseeable that he might act negligently and (2) that Mettille did act negligently as a result of being intoxicated and that his actions were a proximate cause of the fire. Having proven that, they would have shown Monterastelli's negligence. As to instruction 7, the Illinois Pattern Jury Instruction (IPI) relating to intoxication, we find no error in the court's refusal to give that instruction

on the grounds that intoxication was an issue in the case and was covered in the issues instructions. The final two instructions were the standard IPI instructions dealing with proximate cause. (IPI Civil Nos. 21.02, 12.04 (2d ed. 1971).) We would agree with plaintiffs that, given the nature of their theory, Monterastelli's negligence tied to Mettille's alcoholism-related negligence, these two instructions, viewed in isolation, might tend to confuse the jury as to causation. In this respect perhaps some modification should have been made to more closely tailor these instructions to plaintiffs' theory, although given the complex nature of the theory, some confusion seems unavoidable. In any event, when these two instructions are viewed together with the issues instructions, also dealing with causation, we find that the jury was adequately instructed on the issue. Moreover, the basic rule with regard to alleged errors in instructions was that stated by this court in *Schmidt v. Blackwell* (1973), 15 Ill. App. 3d 190, 197, 304 N.E.2d 113:

> "The criterion used by the Illinois courts in reference to the propriety of submitted instructions is whether the jury was fairly, fully and comprehensively informed on the relevant principles, considering the instructions in their entirety. [Citation.] As stated by the court in *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 142 N.E.2d 717, 'The proper approach in considering instructions is not whether each individual instruction is mechanically correct so as not to be subject to some technical objection, but whether or not the instructions when considered as a whole were sufficiently clear so as not to mislead the jury.' "

We have examined the instructions that were given to the jury in this case and we find that they fully, fairly and comprehensively informed the jury of the issues and applicable principles. (*People v. Stock* (1974), 56 Ill. 2d 461, 476, 309 N.E.2d 19.) We find no reversible error in the court's decisions on the instructions.

■■ The final issue raised by plaintiffs need not detain us long. Implicit in our conclusion that the findings of contributory negligence as to Woodward and Johnson Pattern were supported in the evidence is a conclusion that the evidence did not so favor the plaintiffs that they were entitled to a directed verdict on the theory of negligent hiring. As to Ashland Oil, which as a matter of law was not proven contributorily negligent, the evidence did not so favor them that no contrary verdict could stand. There was sufficient evidence for the jury to conclude that Monterastelli did not know, nor could not, in the exercise of ordinary care, have known that Mettille was an alcoholic. There was evidence which the jury could have believed that Mettille was not negligent in starting the fire or in failing to extinguish it. There was evidence that alcoholism could have played no part in any negligence that might have

occurred. The plaintiffs were not entitled to a directed verdict on their negligent hiring theory. Similarly, and for the reason that the evidence could support a verdict for defendant, the plaintiffs were not entitled to a judgment notwithstanding the verdict. *Pedrick v. Peoria and Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

The decisions and judgment of the Circuit Court of La Salle County as to Woodward Welding and Johnson Pattern are affirmed. The judgment of the Circuit Court as to plaintiff Ashland Oil Company is reversed and the cause remanded for a new trial.

Affirmed in part, and reversed in part, and remanded.

STOUDER, P. J., and BARRY, J., concur.